Delores HARMON, Individually and as Executrix of the Estate of Ralph Harmon, Appellee/Cross–Appellant,

v.

UNITED STATES of America, acting through the FARMERS HOME ADMINISTRATION, United States Department of Agriculture; Thomas A. Lloyd, Assistant U.S. Attorney; Dallas Tonsager, State Director of the Farmers Home Administration, Appellants/Cross–Appellees.

Delores HARMON, Individually and as Executrix of the Estate of Ralph Harmon, Appellant,

v.

UNITED STATES of America, acting through the FARMERS HOME ADMINISTRATION, United States Department of Agriculture; Thomas A. Lloyd, Assistant U.S. Attorney; Dallas Tonsager, State Director of the Farmers Home Administration, Appellees.

Nos. 95–3420, 95–3520 and 95–3708.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 23, 1996.

Decided Dec. 2, 1996.

Thomas A. Lloyd, argued, Pierre, SD (Craig P. Gaumer and Karen E. Schreier, U.S. Attorney, Sioux Falls, SD, on the brief), for Appellant.

Robert R. Schaub, argued, Chamberlain, SD, for appellees.

Before FAGG, BOWMAN, and HANSEN, Circuit Judges.

BOWMAN, Circuit Judge.

This case presents a question of first impression in the Courts of Appeals: whether Chapter 12 of the Bankruptcy Code permits a debtor to "strip down" an undersecured creditor's lien to the value of the collateral. We hold that it does and accordingly affirm the judgment of the District Court.[1]

## I.

In 1974, Delores Harmon and her late husband entered into a contract for deed to purchase 917 acres of real estate. Five years later, the Harmons obtained a loan from the Farmers Home Administration, now known as the Farm Service Agency (FSA), and granted the FSA a mortgage on the same property. In September 1987, the Harmons filed for bankruptcy protection under Chapter 12 of the Bankruptcy Code, 11 U.S.C. §§ 1201–1231 (1994). At that time, the Harmons owed $113,800 on the contract for deed and $425,817 on the FSA loan. The FSA filed a proof of claim in the amount of $425,817 in the Harmons' bankruptcy case.

After some preliminary wrangling, the Harmons and the FSA stipulated that the

---

1. The Honorable John B. Jones, United States District Judge for the District of South Dakota.

Harmons' land was worth $165,000, and the Bankruptcy Court entered an order establishing the value at that amount. Because the contract for deed was the first lien against the land, the value of the FSA's security, and therefore the value of its secured claim, was $51,200. The Harmons' First Amended Chapter 12 Reorganization Plan (the Plan) proposed to pay the FSA's secured claim, including interest at nine percent, in thirty annual payments of $4,983.62 each. The Harmons agreed to devote their projected disposable income during the three years following confirmation of the Plan to payment of unsecured claims, including the FSA's unsecured claim for the balance of the loan. The Bankruptcy Court confirmed the Plan on June 16, 1988.

In December 1992, the Harmons agreed to pay the FSA an additional $75,000 out of their disposable income to settle the FSA's objection to their discharge. After the Harmons made payments totaling $75,000, the Bankruptcy Court granted them a discharge on March 16, 1994. In accordance with the Code, the discharge did not include the thirty-year repayment of the FSA's secured claim and similar long-term obligations.

In the meantime, Mrs. Harmon's husband had died in August 1993, and she sought to sell the land. Assistant United States Attorney Thomas Lloyd notified Harmon's attorney that the FSA would require payment of the entire remaining balance of the loan, including the portion that was unsecured in the Harmons' bankruptcy, before releasing its mortgage. Harmon took the position that she owed the FSA the balance of its secured claim and nothing more. In order to facilitate the sale of the land, Harmon and the FSA entered into a stipulation on July 15, 1994, providing that the FSA would transfer its lien from the land to the proceeds of sale, which would be held in escrow pending resolution of the parties' dispute. Several days later, Harmon sold the property for $730,000 and paid off the balance of the FSA's secured claim, which was then $45,671.49. After the payment of costs, $587,798 was escrowed.

As of April 1995, the FSA claimed to be entitled to approximately $309,000 of the proceeds as the unpaid balance of the loan.

Harmon brought this declaratory judgment action in federal district court on behalf of herself and her husband's estate, seeking to quiet title to the escrowed proceeds of sale. She named as defendants the United States (acting through the FSA), Lloyd, and Dallas Tonsager, state director of the FSA. (We will refer to the defendants collectively as the government.) On cross-motions for summary judgment, the District Court granted judgment for Harmon on July 24, 1995, concluding that the FSA's lien was extinguished by the payment in full of the secured claim and the required payments on the unsecured claim. *Harmon v. United States,* 184 B.R. 352, 354–55 (D.S.D.1995). The District Court rejected Harmon's contention that the actions of the government were abusive, arbitrary, capricious, and malicious. *Id.* at 355. The government appeals, and Harmon cross-appeals the declaration that the government did not act arbitrarily.

Harmon applied for attorney fees pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d) (1994), but the District Court denied the application, concluding that the government's position was substantially justified. Harmon also appeals this determination.

## II.

### A.

■ We begin our analysis with a review of the provisions of Chapter 12. When an undersecured creditor files a proof of claim in a bankruptcy case, § 506(a) divides the claim into a secured claim to the extent of the value of the collateral and an unsecured claim for the remainder.[2] *See* 11 U.S.C. § 506(a) (1994); *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 239 & n. 3, 109 S.Ct. 1026, 1029 & n. 3, 103 L.Ed.2d 290 (1989). The debtor files a plan of reorganization that typically proposes repayment of debts over a three-year period. *See* 11

2. Chapters 1, 3, and 5 of the Bankruptcy Code apply to cases under Chapter 12. *See* 11 U.S.C.

§ 103(a) (1994).

U.S.C. §§ 1221, 1222(c) (1994). If the final payment on a secured claim would have been due after the end of the plan period, the debtor may provide for payment of that claim over a period extending beyond the plan. *See* 11 U.S.C. 1222(b)(9) (1994). The plan may "modify the rights of holders of secured claims, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims." 11 U.S.C. § 1222(b)(2) (1994).

The bankruptcy court is required to confirm a plan if, among other things,

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder.

11 U.S.C. § 1225(a)(5) (1994). In addition, if any unsecured claimant objects, the court must ensure that the debtor will devote all disposable income to payments under the plan during the duration of the plan. *See* 11 U.S.C. § 1225(b) (1994).

Upon confirmation, the debtor's property is fully restored to him or her, except as otherwise provided in the plan:

(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the [bankruptcy] estate in the debtor.

(c) [Except for debts that will not be discharged] and except as otherwise provided in the plan or in the order confirming the plan, the property vesting in the debtor under subsection (b) of this section is *free and clear of any claim or interest of any creditor provided for by the plan.*

11 U.S.C. § 1227(b), (c) (1994) (emphasis added).

If the debtor completes making payments under the plan (other than payments that extend beyond the plan period, as described above), the court grants the debtor a discharge "of all debts provided for by the plan" (other than the debts underlying the extended payments). 11 U.S.C. § 1228(a) (1994). A discharge operates as an injunction against any attempt to collect a debt "as a personal liability of the debtor." 11 U.S.C. § 524(a)(2) (1994). A discharge does not, without more, affect a creditor's right to collect a debt in rem by foreclosing a mortgage. *See Johnson v. Home State Bank,* 501 U.S. 78, 83, 111 S.Ct. 2150, 2153–54, 115 L.Ed.2d 66 (1991); *Long v. Bullard,* 117 U.S. 617, 620–21, 6 S.Ct. 917, 918, 29 L.Ed. 1004 (1886).

**B.**

Because several sections of the Code defer to the provisions of the debtor's plan, we must also consider the relevant sections of the Harmons' Plan. The key language of the Plan, contained in the introductory section, provides:

With respect to each allowed secured claim, the debtors' property has been valued as of the effective date of the Plan in an amount not less than the value of the claim. In addition, the holder of any claim, secured or impaired, shall retain its pre-petition lien securing such claim until such time that the claim is fully paid. Following payment of the claim, the holder of the claim shall release the lien.

The section of the Plan devoted to the FSA's claim does not mention the lien but does recite that the Harmons and the FSA have stipulated that the FSA's secured claim is $51,200. This section states further that when the debtors have made their thirtieth payment on the secured claim, "the [FSA] shall release any claim it may have."

The Bankruptcy Court's order confirming the Plan summarizes the statutory requirements of § 1225(a)(5) and does not discuss the FSA's lien specifically.

## C.

· Next we consider the two Supreme Court cases on which the parties have primarily relied: *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), and *Nobelman v. American Sav. Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993).

*Dewsnup* was a Chapter 7 liquidation case. Dewsnup owed a debt of approximately $120,000, secured by property worth $39,000, and sought to "strip down" the creditor's lien to the value of the property. Dewsnup's argument was based on § 506(d) of the Code, which appears to void liens to the extent that they exceed the value of the collateral. *See* 11 U.S.C. § 506(d) (1994) ("To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void...."). The Supreme Court concluded that "allowed secured claim" in § 506(d) does not denote a claim that is allowed and fully secured, but rather a "claim [that] is secured by a lien and has been fully allowed." *Dewsnup*, 502 U.S. at 417, 112 S.Ct. at 778. In other words, if a claim is secured in the non-bankruptcy sense, without regard to § 506(a)'s bifurcation of claims into secured and unsecured claims, and it is allowed in the bankruptcy case, it cannot be voided or stripped down by § 506(d). The Court expressed no opinion as to the meaning of "allowed secured claim" in other sections of the Code. *See id.* at 417 n. 3, 112 S.Ct. at 778 n. 3.

The Court gave two general reasons for its conclusion. First, the Court was concerned that if the lien were stripped down, any subsequent increase in the value of the collateral would benefit the debtor, which it termed a "windfall." *Id.* at 417, 112 S.Ct. at 778. Second, the Court stated that before the enactment of the Code in 1978, "a lien on real property passed through bankruptcy unaffected." *Id.* at 418, 112 S.Ct. at 778. Indeed, the Court said:

> *Apart from reorganization proceedings,* see 11 U.S.C. §§ 616(1) and (10) (1976 ed.), no provision of the pre-Code statute permitted involuntary reduction of the amount of a creditor's lien for any reason other than payment on the debt.

*Id.* at 418–19, 112 S.Ct. at 779 (citing, inter alia, *Long v. Bullard*) (emphasis added). Congress is presumed to have enacted the Code with an understanding of pre-Code practice, and the Court was reluctant to find a significant change without "at least some discussion in the legislative history." *Id.* at 419, 112 S.Ct. at 779. Justice Scalia dissented, outlining the textual and practical difficulties of the Court's interpretation of § 506(d). *See id.* at 420–36, 112 S.Ct. at 779–87 (Scalia, J., dissenting).

*Nobelman* involved a Chapter 13 reorganization. The Nobelmans owed $71,335 on a loan secured by their condominium, which was worth only $23,500 when they sought relief under Chapter 13. Their plan proposed to strip the mortgage down to $23,500, to pay that amount in accordance with the terms of the mortgage contract, and to discharge the balance of the loan as a general unsecured claim. The Supreme Court unanimously affirmed the lower courts' denial of confirmation of the plan, citing § 1322(b)(2) of the Code. *Nobelman*, 508 U.S. at 327, 113 S.Ct. at 2109. That section permits a plan to

> modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence,* or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

11 U.S.C. § 1322(b)(2) (1994) (emphasis added). The same language—with the important exception of the underlined phrase—appears in Chapter 12. *See* 11 U.S.C. § 1222(b)(2) (1994).[3]

The Supreme Court held that the mortgagee was undoubtedly a "holder" of a secured claim and that § 1322(b)(2) prohibited the Nobelmans from modifying the mortgagee's "rights," which the Court interpreted to include state-law property rights. *Nobelman,* 508 U.S. at 328–29, 113 S.Ct. at 2109–10. The Court rejected the argument that the

---

**3.** In 1994, Congress extended the reach of *Nobelman* by adding the language of § 1322(b)(2) to Chapter 11. *See* 11 U.S.C. § 1123(b)(5) (1994). No corresponding amendment was made to Chapter 12.

only rights protected by § 1322(b)(2) were the creditor's rights in its secured claim, as determined by reference to the value of the collateral under § 506(a). *See id.* at 330–31, 113 S.Ct. at 2110–11. Concurring, Justice Stevens remarked that "it seems somewhat strange that the Bankruptcy Code should provide less protection to an individual's interest in retaining possession of his or her home than of other assets" but recognized that § 1322(b)(2) was intended to boost the home lending market by protecting lenders. *Id.* at 332, 113 S.Ct. at 2111–12 (Stevens, J., concurring).

### III.

We now turn to the government's arguments for reversal. The government raises four principal arguments: (1) because § 506(d) applies in Chapter 12, *Dewsnup* should be extended to Chapter 12 cases; (2) the discharge provisions in § 524(a) and § 1228(a) do not affect the debtor's in rem liability; (3) § 1225(a)(5) requires that secured creditors retain their liens; and (4) regardless, the Harmons' Plan did not purport to strip down the FSA's lien.

### A.

■ We begin with the § 506(d) issue. The government argues that because § 506(d), considered in light of the general principle that liens pass through bankruptcy unaffected, does not authorize lien-stripping in Chapter 7, it does not authorize lien-stripping in Chapter 12 either. The government's argument is absolutely correct, but it proves very ·little. Harmon does not argue that § 506(d) strips down liens in Chapter 12, and the District Court did not so hold; indeed, any such argument would conflict with the Supreme Court's holding in *Dewsnup*. The problem with the government's argument is that *Dewsnup* does not hold that § 506(d) *prohibits* lien-stripping in Chapter 7—it holds only that § 506(d) does not itself provide the authority for a debtor to strip down liens. *See Dewsnup*, 502 U.S. at 417, 112 S.Ct. at 778. The lien in *Dewsnup* remained on the property not because § 506(d) mandated that result, but because neither § 506(d) nor any other provision of the Code

applicable in Chapter 7 gave the debtor the power to strip down the lien. The question in this case, therefore, is whether any provision applicable in Chapter 12 provides that power, a question we will address momentarily.

■ For these same reasons, the government's arguments about the discharge provisions in § 524(a) and § 1228(a) are wide of the mark. No one suggests that the discharge provisions remove a lien from the debtor's property or make a lien unenforceable in rem. But it is not accurate or logical to say that if § 524(a) and § 1228(a) do not strip down liens, then lien-stripping is impermissible. Again, the question is whether any other provision of Chapter 12 permits it.

### B.

■ At this point, we think it wise to address the conventional wisdom that liens pass through bankruptcy unaffected. As Judge Posner recently demonstrated in *In re Penrod*, 50 F.3d 459, 461–62 (7th Cir.1995), this "old saw" is actually far too broad, for there are many ways in which liens may be affected by bankruptcy proceedings. To name just a few, a lien may be removed from collateral and replaced by adequate protection if the trustee obtains permission to sell property free and clear of liens, *see* 11 U.S.C. § 363(e)-(f) (1994), or voided if the related claim is disallowed, *see* 11 U.S.C. § 506(d) (1994), or avoided to the extent it impairs an exemption of the debtor, *see* 11 U.S.C. § 522(f) (1994), or avoided if it is the result of a preference or a fraudulent transfer, *see* 11 U.S.C. §§ 547–548 (1994). Because all of these provisions are applicable in Chapter 7, it is not even accurate to say that liens pass through Chapter 7 unaffected.

■ There is, of course, a core of truth to the proposition that liens pass through bankruptcy unaffected. If no proof of claim relating to the lien is filed in the bankruptcy case, the lien will not be affected. *See* 11 U.S.C. § 506(d)(2) (1994); *Long*, 117 U.S. at 620–21, 6 S.Ct. at 918. Similarly, if the bankruptcy court never considers the lien, the plan cannot extinguish it. *See FDIC v. Union Entities (In re Be–Mac Transp. Co.)*,

83 F.3d 1020, 1027 (8th Cir.1996) (lien not extinguished where court rejected claim as not timely filed); *Cen–Pen Corp. v. Hanson,* 58 F.3d 89, 92–93 (4th Cir.1995) (lien not extinguished where no proof of claim was filed and debtor took no action to avoid lien). We need not determine exactly where the line is drawn between those liens that may ride through bankruptcy unscathed and those liens that are subject to modification. It suffices for our purposes that we recognize that a secured creditor who files a proof of claim and participates in a bankruptcy case is not in the same position as one who remains on the sidelines.[4]

## C.

■ Chapters 11, 12, and 13, all reorganization chapters, are sufficiently similar that the parties, as support for their positions, have cited cases from all three chapters. Although it apparently has not been frequently litigated, the weight of authority suggests that lien-stripping is permissible in Chapter 11. *See Wade v. Bradford,* 39 F.3d 1126, 1128–30 (10th Cir.1994); *Dever v. IRS (In re Dever),* 164 B.R. 132, 141–44 (Bankr. C.D.Cal.1994); *cf. In re Penrod,* 50 F.3d at 462–63 (lien may be voided if not preserved by plan). *But see Blue Pac. Car Wash, Inc. v. St. Croix County (In re Blue Pac. Car Wash, Inc.),* 150 B.R. 434, 435–36 (W.D.Wis. 1992) (§ 506(d) does not allow lien-stripping; no discussion of other provisions of Chapter 11). In Chapter 13, it is not seriously disputed that lien-stripping is permissible outside the realm of home mortgages controlled by *Nobelman. See, e.g., Bank One, Chicago v. Flowers,* 183 B.R. 509, 514 & n. 3 (N.D.Ill. 1995) (collecting cases).

The case law on lien-stripping in Chapter 12 is lean, but the cases that do exist support Harmon's position. *See In re Leverett,* 145 B.R. 709, 713–14 (Bankr.W.D.Okla.1992) (lien-stripping effective upon discharge); *cf. Oklahoma ex rel. Comm'rs of Land Office v. Crook (In re Crook),* 966 F.2d 539, 540 (10th Cir.) (stripping down of mortgage held by state does not violate sovereign immunity), *cert. denied,* 506 U.S. 985, 113 S.Ct. 491, 121 L.Ed.2d 430 (1992); *Sealey Bros. v. Farmers Home Admin. (In re Sealey Bros.),* 158 B.R. 801, 804–05 (Bankr.W.D.Mo.1993) (where amount of first lien exceeded value of collateral, second lien was voided by § 506(d); no discussion of *Dewsnup*); *Farm Credit Bank v. Maberry,* 498 N.W.2d 210, 212 (S.D.1993) (creditor may foreclose to full extent of debt before discharge; suggests that lien would be stripped down at discharge).

■ The government's argument focuses on § 1225(a)(5), which we have quoted in full above. That subsection contains three options in the disjunctive, the first of which is that the creditor "has accepted the plan." 11 U.S.C. § 1225(a)(5)(A) (1994). The government acknowledges that it agreed to the confirmation of the Plan. Opening Br. of United States at 30. Harmon therefore suggests that § 1225(a)(5) was satisfied and that we need look no further into the meaning of that section, although she frames the argument rather awkwardly in terms of estoppel, accord and satisfaction, and res judicata. We disagree. The meaning of § 1225(a)(5)(B) is relevant to this case because even though the government accepted the Plan, the parties disagree about what the Plan actually did.[5] Because § 1225(a)(5)(B) created the legal framework within which the

---

**4.** We also note, as the Supreme Court hinted in *Dewsnup,* 502 U.S. at 418–19, 112 S.Ct. at 778–79, that pre-Code law did provide for the modification of liens in reorganization cases. *See* 11 U.S.C. §§ 616(10), 626, 861(12), 874 (1976) (providing for modification of liens and revesting of property free and clear of debts in corporate reorganizations and individual arrangements).

**5.** We do not intend to suggest that res judicata, by which we mean claim preclusion, is irrelevant in bankruptcy cases. If the government were challenging something that actually happened in the confirmation proceedings (e.g., the valuation of the claim on the contract for deed at $113,-

800) or raising an argument that could have been decided during the confirmation hearing (e.g., that the Plan should not have been confirmed because it did not meet the Code's requirements), those arguments would be barred except on appeal of the confirmation order. *See* 11 U.S.C. § 1227(a) (1994) (terms of confirmed plan bind debtor and creditors); *Rowley v. Yarnall,* 22 F.3d 190, 194 (8th Cir.1994). In this case, on the other hand, the parties disagree about the legal effect of the bankruptcy proceedings. This dispute could not have been resolved in the bankruptcy case because the factual circumstances giving rise to it had not yet occurred.

parties negotiated, and because the Plan and the order confirming the Plan track substantially the language of the Code, we must determine what the Code provision means. *See Rowley v. Yarnall,* 22 F.3d 190, 193 (8th Cir.1994) (interpreting Code language and plan language to have same meaning).

▮▮▮▮ We interpret the Code according to its plain meaning unless doing so would produce a result clearly contrary to the intent of its drafters. *See Ron Pair Enters.,* 489 U.S. at 241–42, 109 S.Ct. at 1030–31. Section 1225(a)(5)(B) states that "with respect to each allowed secured claim" the Plan must provide that "the holder of such claim retain the lien securing such claim" and that the present value of property distributed to the creditor "on account of such claim is not less than the allowed amount of such claim." 11 U.S.C. § 1225(a)(5)(B) (1994). The phrase "such claim" in the operative provisions of this section naturally refers to "allowed secured claim" in the introduction. The government suggests that "allowed secured claim" here means the same thing as "allowed secured claim" in § 506(d), as interpreted in *Dewsnup:* the full amount of the creditor's claim that has been allowed. But the Court in *Dewsnup* expressly refused to determine the meaning of "allowed secured claim" outside of § 506(d), *Dewsnup,* 502 U.S. at 417 n. 3, 112 S.Ct. at 778 n. 3, and we conclude that the phrase must have a different meaning in this situation. Section 1225 uses the phrase "allowed unsecured claim" several times, which suggests that the difference between an "allowed secured claim" and an "allowed unsecured claim" is not whether it is secured in the non-bankruptcy sense but whether it is a secured claim as defined by § 506(a).[6] Moreover, the government's interpretation of § 1225(a)(5) would lead to absurd results: the plan would have to provide for the creditor to retain its full lien, and the debtor would have to distribute to the creditor property with a value equivalent to the creditor's full allowed claim—both the secured and unsecured portions. In other words, the debtor would not even be able to discharge his or her in personam liability on

an undersecured debt, no matter how large the debt, if the debt were secured by any collateral at all, no matter how worthless the collateral. This interpretation would make reorganization impossible for many debtors. Accordingly, we conclude that "allowed secured claim" in § 1225(a)(5) must be interpreted by reference to the bifurcation of claims into secured claims and unsecured claims by § 506(a).

▮▮▮▮ One question yet remains: with this interpretation of "allowed secured claim" in mind, what is "the lien securing such claim" which the creditor is entitled to retain? *See* 11 U.S.C. § 1225(a)(5)(B)(i) (1994). The government argues that the creditor should retain the original, pre-bankruptcy lien in its full amount. We believe the more natural reading of this language is that the creditor must retain the pre-bankruptcy lien only insofar as it secures repayment of the secured claim and not insofar as it secures the portion of the debt that has become, by operation of § 506(a), an unsecured claim. We have previously recognized that the words "the lien" in § 1225(a)(5)(B)(i) cannot invariably mean the exact lien on the exact collateral as it existed before bankruptcy. *See Abbott Bank–Thedford v. Hanna (In re Hanna),* 912 F.2d 945, 949–51 (8th Cir.1990) (where lien on livestock would prevent debtor from selling collateral and providing new collateral, lien on herd rather than on particular animals is appropriate). The purpose of the lien-retention requirement is "to adequately protect the creditor's *secured claim* over the course of the plan repayment period." *Id.* at 951 (emphasis added). If § 1225(a)(5)(B)(i) required that the creditor retain its full, original lien, a number of anomalies would result: the creditor's secured claim would be more than adequately protected; the creditor's unsecured claim would also be protected, which might violate the prohibition against differential treatment within the class of unsecured claims, *see* 11 U.S.C. § 1222(a)(3) (1994); and the debtor would have a difficult time reorganizing during a period of depressed land values. We thus conclude that

---

**6.** As Justice Scalia recognized in *Dewsnup,* when the Code means to refer to a creditor's entire claim, it uses the phrase "allowed claim." *See*

*Dewsnup,* 502 U.S. at 422, 112 S.Ct. at 780–81 (Scalia, J., dissenting); 11 U.S.C. § 363(k) (1994) ("lien that secures an allowed claim").

§ 1225(a)(5)(B) requires only that the creditor retain security for the repayment of its secured claim.

Even if we were in doubt about the meaning of the language of § 1225(a)(5), the legislative history is clear that Chapter 12 was intended to "give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land." H.R. Conf. Rep. No. 99–958, at 48 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5246, 5249. Congress was also concerned about the ability of farmers to obtain post-confirmation credit. *See id.* at 50–51, 1986 U.S.C.C.A.N. at 5251–52. If creditors were routinely permitted to retain liens well in excess of the actual value of the farmland, it would be practically impossible for farmers to obtain post-confirmation financing. To the extent the language of § 1225(a)(5) could be construed to suggest the outcome favored by the government, such a construction would be clearly contrary to the intent of the drafters of the Code.

■ Other provisions of Chapter 12 also suggest that lien-stripping is permissible. Section 1222(b)(2) permits a plan to "modify the rights of holders of secured claims." A lien is a property right, *see Nobelman*, 508 U.S. at 328–29, 113 S.Ct. at 2109–10, and the obvious implication of *Nobelman*—an implication made express in Justice Stevens' concurrence—is that lien-stripping is permissible except in the case of home mortgages in Chapter 13, *see id.* at 332, 113 S.Ct. at 2111 (Stevens, J., concurring). Section 1227(c) also has a lien-stripping effect, vesting property in the debtor "free and clear of any claim or interest of any creditor provided for by the plan" unless the plan or the order confirming the plan specifies otherwise.[7] 11 U.S.C. § 1227(c) (1994). The FSA was undoubtedly "provided for by the plan," and a lien is a "claim or interest." *See Johnson*, 501 U.S. at 84, 111 S.Ct. at 2154 (holding that

an in rem lien is a claim); 11 U.S.C. § 101(37) (1994) (defining "lien" as "charge against or interest in property"); 11 U.S.C. § 363(f)(3) (1994) (referring to a lien as a type of interest). Thus, § 1227(c) stripped down the FSA's lien unless the Plan provided otherwise. *See In re Be–Mac Transp.*, 83 F.3d at 1027 (interpreting parallel provision in Chapter 11); *In re Penrod*, 50 F.3d at 463 (same).

### D.

Our conclusions so far now raise another question: did the Plan provide that the FSA's lien would not be stripped down? We agree with the government that the provision of the Plan that "the holder of any claim, secured or impaired, shall retain its pre-petition lien securing such claim until such time that the claim is fully paid" is somewhat confusing. We are unsure why the Plan uses the term "impaired," which is a Chapter 11 term of art that does not appear in Chapter 12. *See* 11 U.S.C. § 1124 (1994).

■ Rather than attempting to divine the meaning of this general language, however, we will focus on the specific section of the Plan that relates to the FSA's claim. In this section, after explaining the thirty-year repayment schedule for the secured claim, the Plan states that when the debtors have made the thirtieth payment, "the [FSA] shall release *any claim it may have*" (emphasis added). When Harmon made the last payment on the secured claim, early though it was, the FSA was required to release all its claims. An in rem lien is a claim, as we noted above. This language is inconsistent with the government's argument that the Plan allowed the FSA to retain its lien, and we thus conclude that the lien was stripped down to the value of the FSA's secured claim.[8]

---

7. The other exceptions in § 1227(c) to free-and-clear vesting refer to nondischargeable debts, *see* 11 U.S.C. § 1228(a)(2) (1994), and to debts being repaid on a long-term schedule, *see* 11 U.S.C. § 1228(a)(1) (1994). A chain of statutory cross-references limits the latter exception to the language of § 1225(a)(5), which, as we have discussed above, provides for the retention of a

creditor's lien only to the extent of its secured claim.

8. We need not determine in this case exactly when the lien was stripped down. Whether the stripping was effective upon confirmation, upon discharge, *see In re Leverett*, 145 B.R. at 713–14, or when Harmon satisfied the secured claim, *see Kinder v. Security Bank & Trust Co. (In re Kind-*

## E.

■ We complete our lien-stripping analysis by disposing of several minor issues raised by the government. First, the government seizes on *Dewsnup*'s recognition that lien-stripping could produce a "windfall" for the debtor. *Dewsnup*, 502 U.S. at 417–18, 112 S.Ct. at 778–79. A windfall, however, is in the eye of the beholder. When Mr. Harmon died, the FSA apparently represented that the Harmons owed only about $43,000. Any recovery by the FSA in this action could therefore be construed as a windfall to the government. In any case, while arguments about windfalls might be appropriate on a direct appeal from confirmation or discharge, we do not find the government's argument persuasive in a collateral proceeding.

■ In another argument, the government backs off a bit. This argument, which is variously phrased in terms of "de facto liquidation" and "prepayment," suggests that because Harmon abandoned the "rehabilitative purposes" of Chapter 12, she should not be entitled to strip down the FSA's lien, which she would not have been able to do if she had liquidated in Chapter 7 originally. The government ignores the rather significant facts that Harmon's husband died in the interim and that she apparently no longer wishes to farm the land in question. Nor is the comparison to Chapter 7 quite correct. If the Harmons had filed under Chapter 7 in 1987, the trustee would have abandoned the farmland, the creditors would have foreclosed their mortgages, and the FSA would have received no more than it did under Chapter 12: the amount of its secured claim (probably less because of the price-depressing effect of a foreclosure sale) and an unsecured claim for the balance. In any event, the government seems to acknowledge that if Harmon had paid off the secured claim over thirty years as originally planned, the FSA's entire lien would have been extinguished at that point. Under this theory, it is only the early

payment that allows the FSA to seek recovery of the balance. Why this should be so is entirely unclear, for the FSA is no worse off for receiving payment of its secured claim early. The Bankruptcy Code has no built-in prepayment penalty, nor does the Plan provide one, and the government's argument that we should imply such a penalty is unpersuasive.

■ Lastly, the government argues that if lien-stripping is possible, it may be done only by means of an adversary proceeding. The government cites Bankruptcy Rule 7001, which states that a proceeding "to determine the validity, priority, or extent of a lien" is an adversary proceeding. Fed. R. Bankr.P. 7001(2). However, the FSA itself moved the Bankruptcy Court under Rule 3012 for a hearing to determine its secured status, and the comment to Rule 3012 distinguishes Rule 7001 as involving challenges to "the basis of the lien itself." Fed. R. Bankr.P. 3012 advisory committee's note. Because the lien as it existed pre-bankruptcy was never challenged, the Rule 3012 motion by the FSA was sufficient to begin the process that eventually ended in the stripping down of the lien. We need not determine precisely when an adversary proceeding is required, for it is sufficient to hold that where a creditor files a proof of claim and initiates the valuation process, the debtor is not required to bring an adversary proceeding to strip down the creditor's lien. *See Halverson v. Estate of Cameron (In re Mathiason)*, 16 F.3d 234, 238 (8th Cir.1994) (recognizing that actions of a party may effectively transform contested motion into adversary proceeding); *In re Penrod*, 50 F.3d at 462–63 (allowing extinguishment of lien without adversary proceeding); *cf. Cen–Pen Corp.*, 58 F.3d at 92–93 (holding that lien survives where validity is at issue and no proof of claim is filed).[9]

## IV.

■ The government also claims that this action should have been dismissed because

er), 139 B.R. 743, 745 (Bankr.W.D.Okla.1992), the lien was extinguished before this suit began.

9. *Simmons v. Savell (In re Simmons)*, 765 F.2d 547 (5th Cir.1985), on which the government

relies, is inapposite because it involved an earlier version of § 506(d) that required the debtor to object to a claim in order to void a lien. *See id.* at 557.

the United States has not waived its sovereign immunity from suit. Participants in the government's various lending programs might be surprised to learn that the government apparently believes it is not subject to suit in connection with these programs. Fortunately for the borrowers, the government is wrong in this case.

[T]he United States may be named a party in any civil action or suit in any district court ... to quiet title to ... real or personal property on which the United States has or claims a mortgage or other lien.

28 U.S.C. § 2410(a)(1) (1994). This statute, cited in Harmon's complaint, constitutes a waiver of the government's sovereign immunity in the circumstances of this case. *See Progressive Consumers Fed. Credit Union v. United States,* 79 F.3d 1228, 1230–31 (1st Cir.1996); *Harrell v. United States,* 13 F.3d 232, 233–34 (7th Cir.1993); *cf. Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands,* 461 U.S. 273, 280, 103 S.Ct. 1811, 1816, 75 L.Ed.2d 840 (1983) (related statute, 28 U.S.C. § 2409a, waives sovereign immunity in quiet-title actions involving government interests other than security interests or water rights).

 The government also argues that the individual defendants, who have been sued in their official capacities, are entitled to dismissal on sovereign immunity grounds because the suit is in reality one against the United States. Because the United States has waived its sovereign immunity, however, the individual defendants have no basis for their objection.

## V.

 In her cross-appeal, Harmon argues that the District Court erroneously concluded that the FSA's actions were not abusive, arbitrary, or capricious. Harmon apparently bases her argument on the FSA's statement to her when her husband died that the loan balance was approximately $43,000, as well as on the FSA's violation of its South Dakota guideline on the disposition of promissory notes. The second argument, involving the FSA's guideline, was not raised in the District Court, and we will not reverse on the basis of an argument raised for the first time in this Court. *See Unigroup, Inc. v. O'Rourke Storage & Transfer Co.,* 980 F.2d 1217, 1222 (8th Cir.1992).

 Harmon has devoted less than three pages of briefing to this issue and has cited only one case. More importantly, her briefs leave us unsure of the nature of her argument, nor do we understand exactly what significance it has. To the extent that we understand the argument, we think it is rendered moot by our decision in Harmon's favor on the lien-stripping issue. In any event, this case does not present the type of agency action to which the usual arbitrary-and-capricious standard of the Administrative Procedure Act applies. *See* 5 U.S.C. §§ 551(13), 706(2)(A) (1994). Given the vagueness of Harmon's argument on this point, the argument must fail even if it somehow escapes mootness.

## VI.

 Harmon also appeals the District Court's denial of attorney fees pursuant to the EAJA. A prevailing party in litigation against the United States is entitled to reasonable attorney fees "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A) (1994). The District Court held that the government's position was substantially justified and that special circumstances, namely the government's loss in the Harmons' bankruptcy and Harmon's financial ability to pay her attorney, also justified a denial of fees. Order Denying Application for Attorney Fees at 1–2. We will reverse a denial of fees only for an abuse of discretion. *See Friends of Boundary Waters Wilderness v. Thomas,* 53 F.3d 881, 884 (8th Cir.1995). In applying this standard, we review conclusions of law de novo and findings of fact for clear error. *See id.* at 885.

 The District Court did not abuse its discretion in concluding that Harmon was not entitled to attorney fees. The government bears the burden of showing that its position is substantially justified. *See id.* A substantially justified position is one that is clearly reasonable, well-founded in law and

fact, and solid, even if it is not necessarily correct.[10] *See id.* We have determined in this case that the government's position is not correct. Nevertheless, the District Court's denial of an award of attorney fees to Harmon must be sustained. In light of the Supreme Court's holdings on lien-stripping in *Dewsnup* and *Nobelman,* the complexity of the provisions of the Code that govern the question of lien-stripping under Chapter 12, and the existence of only one case directly in point nationwide (*In re Leverett,* from the Bankruptcy Court for the Western District of Oklahoma), we cannot say that the government's position in this litigation was not substantially justified.

Because of this conclusion, we need not reach the District Court's alternative reason for denying fees, the existence of special circumstances.

## VII.

■■■■ Finally, we consider two issues raised somewhat obliquely by the parties. A cryptic footnote in Harmon's opening brief suggests that the District Court was without jurisdiction to rule on her fee application because the government had already filed a notice of appeal on the merits. Harmon's argument is legally incorrect. A notice of appeal divests the district court of jurisdiction of " 'those aspects of the case involved in the appeal.' " *Liddell v. Board of Education,* 73 F.3d 819, 822 (8th Cir.1996) (quoting *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58, 103 S.Ct. 400, 401–02, 74 L.Ed.2d 225 (1982)). But where the issue of attorney fees is not before the court of appeals, as it was not in this case on the basis of the government's notice of appeal, the district court may consider it. *See, e.g., Kusay v. United States,* 62 F.3d 192, 194 (7th Cir.1995); *Bensalem Township v. International Surplus Lines Ins. Co.,* 38 F.3d 1303, 1314 n. 9 (3d Cir.1994); *cf. Liddell,* 73 F.3d at 823 (party may not seek fees under one

theory in district court while appealing denial of same fees under another theory).

■■■■ A related question is whether Harmon's fee application was premature. A prevailing party must apply for fees "within thirty days of final judgment in the action." 28 U.S.C. § 2412(d)(1)(B) (1994). A final judgment, for purposes of the EAJA, is one that is "final and not appealable." 28 U.S.C. § 2412(d)(2)(G) (1994). The District Court's judgment in favor of Harmon was therefore not a "final judgment" in EAJA terms. The Supreme Court has questioned, but not decided, whether a litigant may apply for attorney fees before a judgment is final. *See Melkonyan v. Sullivan,* 501 U.S. 89, 103, 111 S.Ct. 2157, 2165–66, 115 L.Ed.2d 78 (1991). We believe the better course is for the district court to refrain from passing on the question of attorney fees until the litigation is final for purposes of the EAJA. In this manner, the district court will be able to evaluate the government's position throughout the dispute and avoid deciding an issue that may become moot if the government prevails on appeal. In the case before us, however, neither party has argued that the District Court's ruling on Harmon's fee request should be vacated because the judgment was not yet final at the time of the ruling, nor do we believe that a premature EAJA application has any jurisdictional significance. Accordingly, we see no time-based reason to disturb the District Court's ruling on the question of attorney fees.

## VIII.

Harmon's motions to supplement the record are granted. For the reasons stated in this opinion, the judgment of the District Court is affirmed in all respects.

**10.** This standard, which derives from a 1986 case, *United States v. 1,378.65 Acres of Land,* 794 F.2d 1313, 1318 (8th Cir.1986), appears to be a more difficult standard for the government to meet than the Supreme Court's 1988 formulation in *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988) (" 'justified in substance or in the main'—that is, justified to a degree that could satisfy a reasonable person"). Because we would affirm under either standard, we will apply the version that would seem to be more favorable to Harmon.