**In re Duane SCHELLHORN, Nina Schellhorn, Debtors.**

**Duane Schellhorn and Nina Schellhorn, Plaintiffs,**

v.

**Farmers Savings Bank, Defendant.**

**In re Twin River Farms, Inc., Debtor.**

**Twin River Farms, Inc., Plaintiff.**

v.

**Farmers Savings Bank, Defendant.**

**Bankruptcy Nos. 87–00424, 87–00425. Adversary Nos. 01–9005, 01–9006.**

United States Bankruptcy Court, N.D. Iowa.

June 17, 2002.

Gary J. Boveia, Waverly, IA, Joseph A. Peiffer, Cedar Rapids, IA, for defendant.

Thomas G. McCuskey, Cedar Rapids, IA, for plaintiffs.

### ORDER

PAUL J. KILBURG, Chief Judge.

These matters came before the Court for trial on April 17, 2002. Plaintiffs/Debtors Duane and Nina Schellhorn and Twin River Farms, Inc. were represented by attorney Thomas McCuskey. Defendant Farmers Savings Bank was represented by attorney Gary Boveia. After hearing evidence and arguments of counsel, the Court took the matter under advisement. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (L).

### STATEMENT OF THE CASE

Debtors request a declaratory judgment that the Bank's secured claims have been properly paid according to Debtors' Chapter 12 plans confirmed in June 1988. They

seek release of the Bank's lien in the Twin River case and a determination of the remaining amount due in the Schellhorn case. The Bank asserts significant amounts remain due on its secured claims in both bankruptcy cases.

## FINDINGS OF FACT

Twin River Farms, Inc., a corporation, and Duane and Nina Schellhorn, individuals, filed separate Chapter 12 cases on February 20, 1987. Plans of Reorganization were confirmed in both cases in October 1988. Debtors eventually completed the plans and discharges were entered on July 12, 1995.

Farmers Savings Bank is a secured creditor. In the Schellhorn case, the Bank was secured by a lien on real estate as well as on personal vehicles and farm supplies. In the Twin River case, the Bank had a lien on machinery and crops. The respective Plans treated the Bank's claims in Class S–1, as follows:

|  | Schellhorn | Twin River |
|---|---|---|
| Amount claimed | 274,945 | $170,326 |
| Amount allowed | 85,000 | 69,050 |
| Interest rate | 10% | 10% |
| Term | 30 years | 12 years |
| Annual payment | $8,197 | $9,212.73 |

In both cases, interest accrued from February 20, 1987, the date the petitions were filed.

Debtor Twin River concluded its 12 years of payments under the Plan in 2000. The Bank asserts a balance of $40,284.48, plus 10% interest from the last payment date, remains due. Debtors argue the claim is paid in full and the Bank should release its liens. The parties also dispute whether Twin River made two additional payments of $6,733.07 and $7,631.81 in October 1987. These alleged payments arose from USDA checks for corn deficiency payments received by Twin River.

In the Schellhorn case, Debtors have paid all their annual payments to date according to the plan provisions. They have been advised by the Bank that the annual payments are insufficient to pay off the entire balance over the 30 year term. The Bank asserts that the current balance due is approximately $119,900, compared to the original amount allowed in the confirmed Plan of $85,000.

Debtors assert that, at the time their plans were confirmed, they did not realize that the plans failed to amortize the debt in full. They argue that, under the plan, as long as they make all the scheduled payments, the debts are paid in full and the Bank's liens must be released. The confirmed plans in both cases include at Article IV, paragraph 4 the provision that payments made under the plans "shall be in full settlement and compromise of the debtors' obligations pursuant to 11 U.S.C. § 1227."

The Bank argues that the full amounts of their allowed secured claims plus 10% interest must be paid in order for the liens to be released. It asserts the amended, confirmed plans provide for prepayments from Debtors. The amended plan in the Twin River case includes this prepayment provision: "Debtors shall have the right to prepay any amounts owed herein without penalty; upon payment of its claim in full, any liens held by a particular creditor shall be released." *In re Twin River Farms, Inc.,* No. 87–00425W, Debtor's Second Amended Chapter 12 Plan at 13 (Bankr. N.D.Iowa October 5, 1988). The amended plan in the Schellhorn case states: "Debtors reserve the right to pre-pay any debts owed hereunder at any time without penalty; in the event that Debtors pre-pay the balance of any debt owed to a secured creditor, all liens on any collateral shall be released at that time." *In re Schellhorn,* No. 87–00424W, Debtor's Second Amended

Chapter 12 Plan at 11–12 (Bankr.N.D.Iowa October 5, 1988). Previous versions of Debtors' plans did not include prepayment provisions. According to the Bank, these provisions recognize that the annual plan payments do not completely amortize the debts. The Bank argues it intended that additional prepayments would be made by Debtors to provide for satisfaction of the total allowed claims plus 10% interest.

Debtor Duane Schellhorn testified that Mrs. Schellhorn handles most of the bookkeeping and pays the bills for both Debtors. He testified they had made all their plan payments and the cases are now closed. Mr. Schellhorn stated he did not know why the prepayment provision was included in the amended confirmed plan. He testified he figured it was in the original plan, too.

Debtor Nina Schellhorn also testified that Debtors had made all plan payments. She stated the payments took all they had and they would have been unable to pay more. She first learned that the payments would not amortize the Bank's claims in 1998 when she called the Bank to get payoff amounts. She received a typed note from F.D. Rewoldt dated 1–21–1998 setting out the balances then due for both Debtors. Prior to that time, Debtors were not aware the plan payments would not pay off the Bank's claims in full. Mrs. Schellhorn testified she assumed the plan payments would pay the debt in full by the end of the term of payments provided for in the plan.

Mrs. Schellhorn also testified regarding the two corn deficiency checks. See Plaintiffs' Exhibit 13. She stated she took the checks to the Bank soon after she received them. This was before Debtors' plans were confirmed. She believes the two checks should be applied against the Bank's claim in the Twin River case. Mrs. Schellhorn testified that she was under the impression that anything paid on debts to the Bank postpetition but preconfirmation would go toward reducing the Bank's claim in the bankruptcy case.

Debtors presented testimony by Sheryl Youngblut, an accountant, who prepared amortization schedules. See Plaintiffs' Exhibit 12. She based the schedules on the payment amounts in the plans and the Trustee's reports of receipts. The Bank's amortization schedules are set out in Exhibits I and J. The calculations on the parties' respective amortizations of Debtors' plan payments are similar. Both parties' amortizations of the Twin River debt as provided for in the confirmed plan show approximately $40,000 remains due. Ms. Youngblut's calculations also include a scenario which applies the two USDA payments to the Twin River debt and shows the debt is overpaid by $5,340.63. The parties' amortizations of the Schellhorn debt as provided for in the confirmed plan show between $119,500 and $120,000 remains due after the 2001 payment. The parties agree the Schellhorns also made a payment on January 15, 2002.

The Bank presented testimony by Dale Matthias, Assistant Cashier, and Linda Schwemm, Teller/Bookkeeper. Both are current employees who worked for the Bank at the time Debtors filed their Chapter 12 petitions. Mr. Matthias testified he knew prior to confirmation that the plan payments would not fully amortize the Bank's claims in the terms provided by the plans. He stated the Bank asked for the prepayment provisions in the amended plans. The Bank's intent was to take lower payments during the first five years of the plan to allow Debtors to afford to remain in farming. Then, by prepayments, Debtors would be able to catch up on the Bank's claims after the first five years. Mr. Matthias testified that Debtors' attorney drafted the prepayment pro-

vision. He stated that the Bank had other objections to the original plans, including sealed grain issues, and that there were more important issues for the Bank at that time than the amortizations and prepayment provisions.

Ms. Schwemm testified that she kept track of Debtors' plan payments for the Bank. She kept copies of all of Debtors' checks. She recorded the payments received and calculated the applicable interest and remaining balances. The USDA checks were not applied against the Twin River debt in 1987. Mrs. Schwemm noted that photocopies of the USDA checks (Ex. 13) do not include the encoding which would appear if the checks were presented to the Bank. Mr. Matthias also testified that he did not believe the Bank ever received the two USDA checks which Debtors assert should be applied against the Twin River debt.

## THE USDA DEFICIENCY CHECKS

In addition to hearing evidence and argument herein, the Court has reviewed the entire Chapter 12 files. Included is a transcript of the August 18, 1993 hearing on Trustee's Final Report and the Bank's objection thereto. In its December 1, 1993 Order, this Court approved the Final Report, concluding, in part, that Debtors were discharged from any liability to the Bank pertaining to the two USDA deficiency checks which are again the subject of controversy now. *In re Twin River Farms, Inc.*, No. 87–00425W, slip op. at 7 (Bankr.N.D.Iowa. Dec. 1, 1993).

The transcript includes testimony by Mr. Rewoldt, the Bank's Cashier. He states that Mrs. Schellhorn deposited the USDA checks in the Twin River checking account and the amounts were never paid to the Bank or for the benefit of the Bank on its guarantee on another of Twin River's debts. Mr. Schellhorn testified at that

hearing that $14,364.88, the total of the two USDA checks dated October 1, 1997, was deposited in Debtor's bank account on October 14, 1987. By November 13, 1987, the account balance was down to $489. Payments were made during that month to landlords and other creditors, but no payments were made to the Bank.

The Schellhorns' current testimony regarding the disposition of the USDA checks was somewhat equivocal. Debtors believe they turned over the checks to the Bank to be applied against the Twin River debt. The Bank believes otherwise. Testimony from the 1993 hearing transcript is closer to the relevant period than the current testimony. Such testimony is dependable as it was given in court, under oath, and subject to cross-examination. The Court concludes the 1993 testimony is more reliable than the testimony elicited at the hearing herein.

The Court finds that Twin River did not make the two additional payments on its debt to the Bank from the USDA checks. The two October 1987 USDA checks in the amounts of $6,733.07 and $7,631.81 which constituted corn deficiency payments were not turned over to the Bank as payment on its secured claim. Twin River's total Chapter 12 payments on the Bank's allowed secured claim were those required by the plan and itemized in the parties' amortization schedules, i.e. annual payments of $9,212.73 for 12 years.

## PRECLUSIVE EFFECT OF CONFIRMED PLAN

██ The provisions of a confirmed Chapter 12 plan bind the debtor and each creditor. *First Nat'l Bank v. Allen,* 118 F.3d 1289, 1294 (8th Cir.1997); 11 U.S.C. § 1227(a). A confirmed plan is a binding contract and res judicata as to all issues decided. *In re Laing,* 31 F.3d 1050, 1051 (10th Cir.1994); *In re Commercial Mill-*

*wright Serv. Corp.*, 245 B.R. 585, 592–93 (Bankr.N.D.Iowa 1998) (considering Chapter 11 plan), *aff'd* 245 B.R. 603 (N.D.Iowa 2000). Confirmation bars arguments challenging something that actually happened in the confirmation proceedings. *Harmon v. United States*, 101 F.3d 574, 582 n. 5 (8th Cir.1996).

■■■ As a general rule, failure to raise an objection at confirmation, or on appeal from a confirmation order, precludes attack on the plan or on any provision of the plan as illegal in a subsequent proceeding. *Adair v. Sherman*, 230 F.3d 890, 894 (7th Cir.2000). If an error in treatment of a claim is included in a plan, res judicata precludes a collateral challenge to the confirmation order, even if the error is jurisdictional. *In re Ivory*, 70 F.3d 73, 75 (9th Cir.1995); *In re Crowley*, 258 B.R. 587, 591 (Bankr.D.Vt.2000). Creditors are precluded from receiving relief from Chapter 12 confirmed plans where they subsequently realize the plan fails to properly treat their claims. *In re Matunas*, 261 B.R. 129, 131 (Bankr.D.N.J.2001) (IRS discovered postconfirmation that certain tax liabilities were not included in its proof of claim); *In re Courson*, 243 B.R. 288, 290 (Bankr.E.D.Tex.1999) (creditor failed to understand plan and sought additional adequate protection postconfirmation). Creditors are barred by confirmed Chapter 12 plans from questioning the valuation of collateral. *In re Webb*, 932 F.2d 155, 158 (2d Cir.1991) (creditor precluded from seeking new valuation of property); *In re Watkins*, 240 B.R. 735, 739 (Bankr.C.D.Ill. 1999) (same).

This Court held in *In re Martin*, 130 B.R. 951, 959 (Bankr.N.D.Iowa 1991), that a creditor could not enforce lien rights not included in the confirmed plan which set out the creditor's allowed secured claim. Chapter 13 plans have similar preclusive effect. For example, in *In re Harnish*,

224 B.R. 91, 94 (Bankr.N.D.Iowa 1998), this Court held that because the Chapter 13 plan was confirmed without preserving the creditor's lien, the lien was extinguished, precluding the creditor's subsequent assertions of the validity of the lien. *Id.* The Court stated that a creditor, who has notice and files a claim in the case, acts at its peril and cannot be excused from failing to monitor its plan treatment. *Id.; see also In re El Khabbaz*, 264 B.R. 204, 208 (Bankr.N.D.Iowa 2001) (holding that a student loan creditor was bound by a Chapter 13 plan discharging the debt, even though the plan provision was based on an erroneous computation of the loan repayment period).

## INTERPRETING THE CONFIRMED PLAN

■■■ A confirmed plan of reorganization "acts like a contract" that binds the parties that participate in the plan. *In re Commercial Millwright Serv. Corp.*, 245 B.R. 603, 606 (N.D.Iowa 2000). In discerning the meaning of a plan, general rules of contract interpretation apply. *United States v. Cook*, 147 B.R. 513, 516 (D.S.D.1992). The plan should be analyzed according to the principles of contract law of the state in which the plan was confirmed. *In re UNR Indus., Inc.*, 212 B.R. 295, 301 (Bankr.N.D.Ill.1997).

Some courts have stated that generally, debtors will bear the burden of any ambiguity in a plan they draft. *In re Leis*, 198 B.R. 257, 261 (Bankr.N.D.Ohio 1996) (Chapter 13 plan); *In re Harstad*, 155 B.R. 500, 510–11 (Bankr.D.Minn.1993) (Chapter 11 plan), *aff'd on other grounds* 39 F.3d 898 (8th Cir.1994). This principle may not be applicable, however, where both parties to the "contract" have relatively equal bargaining strengths. *See Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 119 F.3d 688, 692 (8th Cir.1997).

■ A confirmed plan is analogous to a consent decree. *In re Doty*, 129 B.R. 571, 591 (Bankr.N.D.Ind.1991). As such, the plan embodies a compromise between the parties which has been approved by the court. *Browning v. Navarro*, 743 F.2d 1069, 1081 (5th Cir.1984). As *Browning* noted, the U.S. Supreme Court has stated:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.

*United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971).

■ The Court has considered the Iowa law on contracts. In *Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001), the Iowa Supreme Court recently set out the principles of contract interpretation. "The primary goal of contract interpretation is to determine the parties' intentions at the time they executed the contract." *Id.* If a term is ambiguous, the court must choose among possible meanings, which may involve receiving extrinsic evidence. *Id.* "The words of an integrated agreement remain the most important evidence of intention." *Id.; see also Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999). In interpreting a contract, the court gives effect to language of the entire contract in accordance with its commonly accepted and ordinary meaning. *Lange v. Lange*, 520 N.W.2d 113, 119 (Iowa 1994).

The Iowa Supreme Court often refers to the Restatement (Second) of Contracts when interpreting or construing contracts. Both Sections 158 and 204 of the Restatement note that when the parties have not agreed with respect to a term that is essential to a determination of their rights and duties, the court will supply a term that is reasonable in the circumstances. Restatement (Second) of Contracts § 158 cmt. c and § 204 (1981). When an omitted term arises where the parties in fact have not agreed to the term, the court will supply a term comporting with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process. *Id.* § 204 cmt. d. The goal of these rules is to avoid injustice.

Along these lines, the Court has found one case which considered an internal inconsistency regarding the interest rate in a note. In *Paradise Restaurant, Inc. v. Somerset Enters., Inc.*, 164 Vt. 405, 671 A.2d 1258, 1260 (1995), the note provided for interest of 9.5% and contained no provision for a balloon payment but the payment schedule provided for 4.5% interest. The parties agreed the note was internally inconsistent "because the stated interest rate of 9.5% could not be reconciled with the payment schedule set forth in the note." *Id.* at 1261. The court stated the question was whether the parties tacitly assented to a lower effective interest rate than stated in the note, or rather intended some other means of making up for a

lower rate either during the out years of the note or with a balloon payment at its maturity. *Id.* at 1261 n. 2. The court stated: "The note in the present case is not ambiguous. It is defective and incapable of consistent interpretation." Thus, the court could not discern the actual agreement of the parties. *Id.* at 1262. As such, the court remanded for a determination of what remedial approach comes closest to treating each party fairly and equitably and to resolve the dispute in the way most likely to enforce the parties' expectations. *Id.* at 1263 (citing Restatement (2d) of Contracts § 158 cmt. c (1981)).

## CONCLUSIONS

Debtors' Chapter 12 plans confirmed in October 1988 are binding. Even if the plans' treatment of the Bank's claims is not proper under the provisions of Chapter 12, the Bank is precluded from seeking different treatment now. The question is how to interpret the plans' treatment of the Bank's claims.

Applying principles of Iowa contract law, the Court has attempted to determine the intent of the parties. In these circumstances, the Court refuses to apply the principle of construing against the drafter. It is undisputed that Debtors drafted the Chapter 12 plans. However, the parties' respective bargaining strengths were relatively equal. More telling is the fact that the Bank is in the business of numbers and loans and Debtors are in the business of farming. As such, the Bank could be deemed more responsible for any errors in drafting, as it has greater expertise in dealing with loans and percentage rates and payments. The Court will not use contract principles to construe against either party in these circumstances. The most applicable rule of contract interpretation in this case is to focus on the four corners of the document, keeping in mind that this is essentially a consent decree embodying a compromise between the parties.

The offending provisions of Debtors' plans cannot be said to be ambiguous. The record indicates that the treatment of the Bank's claims does not accurately reflect the intentions of the Bank or of Debtors. Rather, the parties' respective intentions appear not to have been reconciled on the matter of repayment of the Bank's claims. The Court is left in the position of trying to sort out the unsortable by somehow divining the intent of the parties. For any number of reasons, the parties either failed to express their intent or never had a meeting of the minds on this matter. As there appears to be no "legal" resolution, the Court must resort to common sense.

Similar to the note in *Paradise Restaurant,* the Plans herein are defective in their treatment of the Bank's claims and incapable of consistent interpretation. The Court will attempt to treat each party fairly and equitably and come as close as possible to enforcing the parties' expectations while maintaining the preclusive effect of the confirmed plans as written.

In the Schellhorn case, the Bank's allowed claim of $85,000 was to be paid over 30 years with interest of 10% through annual payments of $8,197. It is obvious at first glance that such payments will not amortize the entire debt. Debtors point to Article IV, paragraphs 1 and 4 of the plan which state payments under the plan shall be in full settlement of Debtors' obligations and liens shall be released when secured claims are paid in full. They believe that this requires release of the Bank's lien upon completion of 30 annual payments of $8197.

The Bank points to paragraph 5 of Article IV of the plan which states "Debtors reserve the right to pre-pay any debts

owed hereunder" and liens shall be released upon pre-payment of the balance owed to a secured creditor. The Bank believes this provision requires prepayment by Debtors of the amount of its claim which remains due beyond the 30 annual payments of $8197.

In other words, the Bank was aware the 30 annual payments of $8197 would not pay its claim in full and expected Debtors to "prepay" the remainder. Debtors believed the 30 annual payments would pay the claim in full and the Bank would then release its liens. In this situation, the Court concludes that the Bank unreasonably relied on the pre-payment provision of the plan. Prepayment of a portion of the Bank's claim is not required by that paragraph. Rather, it merely reserves to Debtors the right to prepay to secure early release of liens. Debtors' expectation that 30 annual payments of $8197 would satisfy the Bank's lien is more reasonable, even though on its face it is apparent the payments were insufficient to completely amortize the Bank's entire $85,000 claim with 10% interest.

The plan is clear in stating that payments under the plan are in full settlement of Debtors' obligations, making Debtors' belief more reasonable than the Bank's. The Court also notes that testimony presented by the Bank acknowledges that the treatment of this portion of its claim was not the most important issue to the Bank at the time. At the time of confirmation, the Bank was more focused on the disposition of sealed grain and other matters than it was on protecting the value of its secured claim through 30 years of payments. In these circumstances, the Bank must bear the consequences of any inattention.

As the Plans in the Schellhorn and Twin River cases are nearly indistinguishable, this analysis applies to both cases. The Court concludes the Bank's claim in the Twin River case is fully paid by the 12 annual payments of $9,212.73 the Bank has already received as required by the plan. Despite the Bank's expectations, the plan does not require Debtor to prepay any balance the Bank asserts is due to gain release of the liens. The Bank is ordered to release its liens on collateral machinery and crops which secured its claim in the Twin River case.

In the Schellhorn case, Debtors have made 14 annual payments of $8197. The Bank's claim will be satisfied in full through the future stream of payments of $8197 per year for the next 16 years. The Court has calculated that annual payments of $8197 over 30 years yields an actual, effective interest rate of 8.8955% on principal of $85,000. The Bank believed it bargained for 10% interest and that rate is stated in the plan. The plan failed to provide for full payment of the Bank's claim, however, either through the amortization of payments or through prepayments. The Court concludes that the only way to give full effect to the plan is to find that the Bank is entitled to the actual amount of interest provided by the amortization of the debt in the Plan. That interest rate is 8.8955%. This is the actual yield the Bank has been receiving during the first 14 years of payments. Likewise, this rate is applicable as the discount rate in determining the present value of the remaining 16 annual payments of $8197.

To satisfy the Bank's claim in full, Debtors may continue to make the scheduled annual payments of $8197 over the next 16 years. Alternatively, Debtors may choose to satisfy the Bank's claim at any time by making a one-time lump sum payment. The amount of the one-time lump sum payment can be calculated by computing the present value of the 16 annual payments as of the date Debtor wishes to satisfy Bank's claim.

The $8197 payments incorporate both principal and interest. According to the Court's calculations, simple interest accrues at a rate of 8.8955% per annum on the outstanding principal. The present value of the remaining 16 annual payments can be determined by discounting each of the payments by a rate of 8.8955% per period back to the desired payoff date. For example, if Debtor wished to satisfy the Bank's claim on June 15, 2002, Debtor would need to make a one-time lump sum payment of $71,105.86 on such date. This includes the principal amount of $68,852 plus simple interest at 8.8955% of $2,523.86, which accrued from the last payment date, January 15, 2002. For a July 15, 2002 payoff, the lump sum amount would be $71,607.28 ($68,582 principle plus $3,025.28 interest from 1/15/02). The parties will use this formula for computing payoffs on other dates.

In summary, the Schellhorns may satisfy the Bank's claim by continuing to pay the remaining 16 scheduled annual payments. In the alternative, Debtors may pay the present value of the remaining payments. Present value shall be calculated using a 8.8955% discount rate. When Debtors have satisfied the Bank's claim under either of these alternatives, the Bank shall release its liens on the real estate, vehicles and farm supplies which secure its claim in the Schellhorn case.

**WHEREFORE,** Debtors' Complaints requesting declaratory judgment are GRANTED.

**FURTHER,** Farmers Savings Bank shall, within 30 days of the date of this ruling, release all liens which secure its claim in the Twin River Farms, Inc. Chapter 12 case.

**FURTHER,** Debtors may satisfy the Bank's claim in the Schellhorn case either through payment of the 16 annual payments remaining due under the plan, or payment of the present value of such payments as set out in this ruling.

**FURTHER,** the present value of the Bank's claim in the Schellhorn case equals the principal balance due of $68,582 plus simple interest at 8.8955% accruing from January 15, 2002.

**FURTHER,** Farmers Savings Bank shall release all liens securing its claim in the Schellhorn Chapter 12 case within 30 days of receiving from Debtors either (1) the present value of its claim as set out herein, or (2) the 30th annual payment as scheduled in the plan.