*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2002 FED App. 0049P (6th Cir.)
File Name: 02a0049p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

In re: GEORGE E. LANE and
SHERRY A. LANE,

            *Debtors.*

————————————

GEORGE E. LANE and SHERRY
A. LANE,

            *Appellants,*

        *v.*

WESTERN INTERSTATE
BANCORP, as Successor
Servicer to FirstPlus
Financial, Inc.,

            *Appellee.*

No. 00-5986

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 00-00278—James H. Jarvis, District Judge.

Submitted: October 24, 2001

Decided and Filed: February 7, 2002

Before:  NELSON, DAUGHTREY, and MOORE, Circuit Judges.

———————————

**COUNSEL**

**ON BRIEF:**  Brenda Gail Brooks, MOORE, BROOKS & RAGLE, Knoxville, Tennessee, for Appellants.  Anthony R. Steele, WINCHESTER, SELLERS, FOSTER & STEELE, Knoxville, Tennessee, for Appellee.

———————————

**OPINION**

———————————

DAVID A. NELSON, Circuit Judge.  The bankruptcy code expressly provides that a Chapter 13 bankruptcy plan may modify the rights of holders of "unsecured claims." 11 U.S.C. § 1322(b)(2). This section also provides that such a plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence . . . ." *Id.*

Whether a lienholder has a "secured claim" or an "unsecured claim," in the sense in which those terms are used in the bankruptcy code, depends on whether the lienholder's interest in the collateral has economic value. See 11 U.S.C. § 506(a).  Where a creditor holds a second mortgage on a homestead valued at less than the debtor's secured obligation to a first mortgagee, for example, the holder of the second mortgage has only an "unsecured claim" for § 506(a) purposes.

The appellee in the case at bar is such an unsecured creditor – a second mortgagee whose lien on the Chapter 13 debtor's homestead is totally under water.  If the lien were only partially under water (*i.e.* if the second mortgagee's claim had a secured component, being unsecured only in part), the Supreme Court's decision in *Nobelman v. American Savings*

– If a claimant's lien on the debtor's homestead has no value at all, on the other hand, the claimant holds an "unsecured claim" and the claimant's contractual rights are subject to modification by the plan.

A "secured claim/unsecured claim" touchstone may seem arbitrary, to be sure, especially where the assignment of value *vel non* presents a close question of fact.  As can be attested by anyone who has ever struggled with the Internal Revenue Code or similar artifacts of the modern administrative state, however, we live in a world that abounds with arbitrary distinctions.  Absent a challenge on constitutional grounds – and none has been asserted here – this court holds no warrant to cleanse the United States Code of arbitrary distinctions.

Our job, obviously, is to see that congressional enactments are applied in accordance with the presumed intent of Congress, as manifested in the language Congress has chosen to use.  In the case at bar, for reasons we have explained, it seems to us that the bankruptcy court misapplied the relevant language of the bankruptcy code.  The judgment in which the district court affirmed the bankruptcy court's decision is therefore **REVERSED**, and the case is **REMANDED** for further proceedings not inconsistent with this opinion.

'secured claims,'" a subset that on *Nobelman*'s facts would consist of the $23,500 secured component of the bank's overall claim. *Id*. The Supreme Court rejected this suggestion, pointing out that "§ 506(a) itself uses the phrase 'claim . . . secured by a lien' to encompass both portions of an undersecured claim." *Id*. at 331.

The implications of this portion of the *Nobelman* opinion, it seems to us, do not extend beyond the situation to which the language just quoted alludes – the situation in which the lienholder's claim for the amount due has both a secured component and an unsecured component. Any broader implication, as we see it, would run counter to the logic of *Nobelman*'s reliance on the fact that the bank in that case was "still the 'holder' of a 'secured claim,' because [the debtors'] home retains $23,500 of value as collateral." *Id*. at 329. And although some have read conflicting messages into *Nobelman*, the message conveyed by the language of the statute itself, read in the light of the *Nobelman* holding, strikes us as perfectly clear.

The message, to recapitulate, is this:

– Section 1322(b)(2) prohibits modification of the rights of a holder of a secured claim if the security consists of a lien on the debtor's principal residence;

– Section 1322(b)(2) permits modification of the rights of an unsecured claimholder;

– Whether a lien claimant is the holder of a "secured claim" or an "unsecured claim" depends, thanks to § 506(a), on whether the claimant's security interest has any actual "value;"

– If a claimant's lien on the debtor's homestead has a positive value, no matter how small in relation to the total claim, the claimant holds a "secured claim" and the claimant's contractual rights under the loan documents are not subject to modification by the Chapter 13 plan;

*Bank*, 508 U.S. 324 (1993), teaches that the rights of the lienholder would not be subject to modification. The question before us now is whether the implications of *Nobelman* would bar modification of the rights of a creditor who, although the holder of a lien on the Chapter 13 debtor's homestead, has solely an "unsecured claim" under § 506(a).

The issue is one on which the courts are divided. Under the majority view, it is permissible for a Chapter 13 plan to modify the rights of such an unsecured creditor; the minority view is that modification is prohibited. The bankruptcy court adopted the minority position in the case at bar, and the district court affirmed on appeal.

We shall reverse. It does not appear to us that *Nobelman* forecloses what we take to be the better reading of the code. Under that reading, which is consistent with the result reached by all of the four other courts of appeals and both of the bankruptcy appellate panels that have addressed the question, modification of the rights of a totally unsecured homestead mortgagee is permitted by § 1322(b)(2).

I

The facts of the instant case were largely placed before the bankruptcy court by stipulation. Here is a brief summary.

In 1996 the debtors, George and Sherry Lane, obtained a loan secured by a first mortgage on what we take to have been their sole residence. This mortgage was assigned to CIT Group, along with the Lanes' promissory note.

The Lanes took out a second mortgage loan on their residence a year later. The second mortgage and mortgage note were assigned to FirstPlus Financial, Inc.[1]  Neither

---

[1] Western Interstate Bancorp succeeded FirstPlus as "servicer" of the second mortgage, but the parties consistently refer to the second mortgagee as "FirstPlus." We shall do the same.

FirstPlus nor CIT had any relevant security interest outside its mortgage, as far as the record discloses.

In November of 1999 the Lanes sought protection under Chapter 13 of the bankruptcy code. Soon thereafter CIT filed a proof of claim showing a balance of $40,223.79 due and owing on the senior mortgage obligation. There is no dispute as to the validity or amount of this claim.

FirstPlus filed a proof of claim showing $22,146.69 due and owing on the junior mortgage obligation. FirstPlus has stipulated that the value of the Lanes' residence was less than the $40,223.79 balance due on the first mortgage. (The stipulation does not give a dollar value for the residence, but a brief filed by FirstPlus in the bankruptcy court put the value of the property at no more than $38,000.00.)

The debtors filed a repayment plan proposing that CIT would receive its regular monthly mortgage payment and that FirstPlus would be paid only as an unsecured claimant. The dividend for holders of unsecured claims would be in the range of 20 cents to 70 cents on the dollar, according to the plan.

FirstPlus objected to confirmation of the plan. In a brief supporting its objection, FirstPlus argued that 11 U.S.C. § 1322(b)(2) barred modification of its contractual rights because of the undisputed fact that its claim was one "secured only by a security interest in real property that is the Debtors' principal residence." The bankruptcy court accepted this argument and denied confirmation of the plan in the form proposed. See *In re Lane*, 248 B.R. 534 (Bankr. E.D. Tenn. 2000). When the district court affirmed the bankruptcy court's order, the Lanes appealed to this court.

## II

Lawyers often think of any claim for repayment of a mortgage loan as a "secured claim" whether or not the mortgagee could actually realize anything at a foreclosure sale. Under the bankruptcy code, however, "[a]n allowed

*Nobelman*, 508 U.S. at 331, where the Supreme Court so described the term), "unsecured claims" is a term of art too. Courts subscribing to the minority position often ignore this; they proceed as if the phrase "holders of unsecured claims" meant nothing more than claimants without any liens. But when Congress divided the universe of claimants into those with "secured claims" and those with "unsecured claims," it was not merely distinguishing between claimants possessed of security interests and claimants not possessed of such interests. Insofar as claimants with homestead liens are concerned, rather, the dividing line drawn by § 1322(b)(2) runs between the lienholder whose security interest in the homestead property has some "value," see § 506(a), and the lienholder whose security interest is valueless.

In the case at bar, as we have seen, the security interest that FirstPlus holds in the debtors' homestead property is totally valueless. FirstPlus is thus the holder of an "unsecured claim," pure and simple – and if the words of § 1322(b)(1) mean what they plainly say, the rights of a creditor holding such a claim "may" be modified by the debtors' Chapter 13 plan.

In *Nobelman*, by contrast, the bank was on the other side of the dividing line. The fact that the bank's security interest had a positive dollar value meant that the bank's claim for payment of the full amount of the loan was a "secured claim" within the meaning of § 506(a). It was for precisely this reason, as we read the *Nobelman* opinion, that the bank's unitary contract rights were held to be entitled to the protection of the antimodification clause.

It is true, as several of the courts adopting the minority position have pointed out, that the *Nobelman* Court was unmoved by "the so-called 'rule of the last antecedent.'" *Nobelman*, 508 U.S. at 330. Under that rule, as a grammatical matter, the antimodification clause of § 1322(b)(2) should be read as modifying "secured claims," its immediate antecedent. Such a reading might seem to suggest that the protection of § 1322(b)(2) should extend only to a "subset of allowed

Collier's explanation of the implications of *Nobelman* finds strong support, we believe, in the Supreme Court's declaration that the debtors in *Nobelman* "were correct in looking to § 506(a) for a judicial valuation of the collateral to determine the status of the bank's secured claim." *Nobelman*, 508 U.S. at 328. At the court-of-appeals stage of the Nobelman litigation, the Fifth Circuit had ruled in favor of the bank under the theory that, on the facts presented, § 1322(b)(2) rendered § 506(a) a nullity. See *In re Nobleman*, 968 F.2d 483, 489 (5th Cir. 1992). The Supreme Court rejected that theory – and in so doing, as the Fifth Circuit subsequently observed, the Supreme Court "confirm[ed] that § 506(a) is the starting point in the analysis . . . ." *Bartee*, 212 F.3d at 286.

The Supreme Court's recognition of § 506(a) as the starting point in the analysis means that it must make a difference whether the overall claim belongs in the pigeonhole marked "secured claims" or the pigeonhole marked "unsecured claims," as those terms are defined in § 506(a). The proper classification under § 506(a) obviously makes a difference even where the creditor has "a claim secured only by a security interest in real property that is the debtor's principal residence," as the bank did in *Nobelman* and as FirstPlus does here. And the only apparent reason why the classification could make a difference is that the special protection accorded by the antimodification provision extends to the rights of holders of "secured claims" and does not extend to the rights of holders of "unsecured claims."

To interpret § 1322(b)(2) otherwise, we believe, would be to subvert the text of the code. Section 1322(b)(2) says, without qualification and in the plainest of English, that a Chapter 13 plan "may" modify the rights "of holders of unsecured claims." For us to hold that the plan may *not* modify the rights of such a claimholder would be to thumb our noses at Congress' carefully chosen words.

It is important, in this connection, to remember that just as "secured claims" is a term of art in the bankruptcy code (see

claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent [and only to the extent] of the *value* of such creditor's interest in the estate's interest in such property . . . ." 11 U.S.C. § 506(a) (emphasis supplied). Conversely, the claim "is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." *Id.*[2] Subject to exceptions not relevant here, 11 U.S.C. § 103(a) makes § 506(a) applicable in a Chapter 13 bankruptcy case.

The principal residence of the debtors whose Chapter 13 plan was considered by the Supreme Court in *Nobelman v. American Savings Bank*, 508 U.S. 324 (1993), had an uncontroverted value of $23,500. The property was mortgaged to a bank that submitted a proof of claim for three times that amount. The debtors filed a plan in which, on the strength of § 506(a), they proposed to bifurcate the bank's claim into a $23,500 secured claim and a larger unsecured claim. The secured component would be paid in full, under the plan, and the unsecured component would be written off. The Supreme Court refused to sanction this plan, holding that insofar as the proposed bifurcation would result in modification of the rights of the bank under its mortgage, the plan ran afoul of the "other than" clause of 11 U.S.C. § 1322(b)(2).[3]

---

[2] Section 506(a) goes on to provide that "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest."

[3] The clause in question, sometimes referred to as the "antimodification clause," is the one we have placed in italics in the quotation that follows:

"Subject to subsections (a) and (c) of this section, the plan may –

* * *

(2) modify the rights of holders of secured claims,

In reaching this conclusion, the *Nobelman* Court decided that the phrase used in the antimodification clause – "a claim secured only by a security interest in real property that is the debtor's principal residence" – should be read as encompassing the unsecured component of the bank's overall claim as well as the secured component. *Nobelman*, 508 U.S. at 331. Otherwise, the Court pointed out, it would be impossible to protect the bank's rights in the manner intended by Congress:

> "The bank's contractual rights are contained in a unitary note that applies at once to the bank's overall claim, including both the secured and unsecured components. [The debtors] cannot modify the payment and interest terms for the unsecured component, as they propose to do, without also modifying the terms of the secured component." *Id.*

This being so, and given the focus of § 1322(b)(2) on the "rights" of the bank, see *Nobelman*, 508 U.S. at 328, the Court held that the bank's rights were fully protected by the antimodification clause notwithstanding that the amount of the bank's overall claim exceeded the value of the bank's security interest in the homestead.

The *Nobelman* Court had no occasion to say what the result would have been if the bank's claim had involved no secured component at all. In a passage consistent with the position adopted by a number of lower courts, however, the author of one leading bankruptcy treatise has said that "[t]he clear implication of [*Nobelman*'s] analysis is that even a completely *unsecured* claim holder with a lien on real property that is the debtor's principal residence would be protected from modification by § 1322(b)(2), notwithstanding that such an 'unsecured' lienholder could not have an

---

other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims . . . ." 11 U.S.C. § 1322(b)(2) (emphasis supplied).

allowable secured claim under § 506(a)." K.M. Lundin, Bankruptcy, § 128.1, at 128-2 (3d ed. 2000).[4]

Strictly as a matter of syntactics, perhaps, there is something to be said for this conclusion. But the majority of courts that have been called upon to adjudicate the rights of lienholders asserting purely "unsecured claims" have declined to read *Nobelman* as placing such lienholders in the class of claimants whose rights are entitled to special protection under the antimodification clause of § 1322(b)(2).[5]

The Collier bankruptcy treatise endorses the majority position: "The *Nobelman* opinion strongly suggests . . . that if a lien is completely undersecured, there would be a different result." 8 Collier on Bankruptcy ¶ 1322.06[1][a][i] (15th ed. rev. 2001). As Collier correctly notes, "[t]he opinion relies on the fact that, even after bifurcation, the creditor in the case was 'still the "holder" of a "secured claim" because [the debtors'] home retain[ed] $23,000 of value as collateral.'" *Id.* (quoting *Nobelman*, 508 U.S. at 329). "If the creditor had held a lien on property that had no value . . .," Collier continues, "then under this analysis, the creditor would not have been a 'holder of a secured claim' entitled to protection by section 1322(b)(2)." *Id.*

---

[4] Judge Lundin's treatise collects several of these minority-view cases. See Lundin § 128.1, at 128-12-128-16 n. 9. A somewhat more complete and updated list appears in *In re Mann*, 249 B.R. 831, 836 n. 9 (B.A.P. 1st Cir. 2000). Many of the cases cited in these sources have subsequently been abrogated by appellate court rulings in the relevant circuits.

[5] See *Pond v. Farm Specialist Realty (In re Pond)*, 252 F.3d 122 (2d Cir. 2001); *Tanner v. FirstPlus Financial, Inc. (In re Tanner)*, 217 F.3d 1357 (11th Cir. 2000); *Bartee v. Tara Colony Homeowners Assoc. (In re Bartee)*, 212 F.3d 277 (5th Cir. 2000); *McDonald v. Master Financial, Inc. (In re McDonald)*, 205 F.3d 606 (3d Cir. 2000); *In re Mann*, 249 B.R. 831 (B.A.P. 1st Cir. 2000); *In re Lam*, 211 B.R. 36 (B.A.P. 9th Cir. 1997). For a listing of majority-view cases in the bankruptcy courts, see *Mann*, 249 B.R. at 836 n. 8.