**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 4, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENND CIRCUIT

In re: KENNETH WOOLSEY;
STEPHANIE WOOLSEY,

        Debtors.

-------------------------------

KENNETH WOOLSEY; STEPHANIE
WOOLSEY,

        Appellants,

v.

CITIBANK, N.A.,

        Appellee,

KEVIN R. ANDERSON, Chapter 13
Trustee,

        Trustee - Appellee,

NATIONAL ASSOCIATION OF
CONSUMER BANKRUPTCY
ATTORNEYS,

        Amicus Curiae.

No. 11-4014

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:10-CV-01097-BSJ)**

David M. Cook, Salt Lake City, Utah, for Debtors-Appellants.

Mariah E. Murphy (Anthony C. Kaye and Steven D. Burt with her on the briefs), Ballard Spahr LLP, Salt Lake City, Utah, for Appellee Citibank.

Kevin R. Anderson, Salt Lake City, Utah, for Trustee-Appellee.

Tara Twomey, San Jose, California, for Amicus Curiae National Association of Consumer Bankruptcy Attorneys.

---

Before **GORSUCH, HOLMES,** and **MATHESON**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

Like so many these days, Stephanie and Kenneth Woolsey owe more money on their home than it's worth. In fact, the value of their home doesn't come close to covering the balance due on their first mortgage, much less the amount they owe on a second. And it's that second mortgage, held by Citibank, at the center of our case. After the Woolseys sought shelter in bankruptcy, they prepared a Chapter 13 repayment plan. In their plan, they took the position that the bankruptcy code voids Citibank's lien because it is unsupported by any current value in the home. Naturally, Citibank didn't take well to the Woolseys' intentions. The bank objected to the Woolseys' plan and eventually persuaded the bankruptcy court to reject it. Later the district court, too, sided with Citibank and now the question has found its way to us.

- 2 -

Before us, though, the Woolseys don't just shrink from, they repudiate the only possible winning argument they may have had. They choose to pursue instead and exclusively a line of attack long foreclosed by Supreme Court precedent. To be sure, the Woolseys argue vigorously and with some support that the Supreme Court has it wrong. But, as Justice Jackson reminds us, whether or not the Supreme Court is infallible, it *is* final. *See Brown v. Allen*, 344 U.S. 443, 540 (1953) (Jackson, J., concurring in the result). And it belongs to that Court, not this one, to decide whether to revisit its precedent. For now, and like the other judges to have passed on this case so far, we are obliged to apply the Court's current case law and that leads us, inexorably, to affirm.

\* \* \*

But before we can get to all that, there's a jurisdictional snarl we have to untangle first. After Citibank successfully objected to the Woolseys' initial repayment plan, the bankruptcy court issued an order rejecting it. That order, of course, was hardly an appealable final decision spelling the end to things in bankruptcy court: it promised only more litigation until an amended repayment plan could win the bankruptcy court's approval. *See Simons v. FDIC (In re Simons)*, 908 F.2d 643, 645 (10th Cir. 1990). All the same, the Woolseys appealed the bankruptcy court's order to the district court. And this they could do because 28 U.S.C. § 158(a)(3) permits interlocutory appeals in these particular circumstances. For its part, however, the district court soon issued a summary

- 3 -

order affirming the bankruptcy court's rejection of the Woolseys' initial plan, and it is that decision the Woolseys now seek to appeal to our court.

And that raises this question: Do we have the power to hear an interlocutory appeal of an interlocutory appeal? By what authority might we entertain an appeal from the district court of an interlocutory order regarding a matter pending in bankruptcy court? To be sure, the Woolseys could have sought permission to proceed to this court under the general interlocutory appeal statute, 28 U.S.C. § 1292(b). *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992). But they didn't. Instead and at their behest, the district court purported to certify its interlocutory appeal for a further interlocutory appeal to this court under 28 U.S.C. § 158(d)(2)(A). Can a district court *do* that?

When a case is properly certified by the bankruptcy court, district court or bankruptcy appellate panel, Congress through § 158(d)(2)(A) has clearly given this court the power to hear "appeals described in the first sentence of [§ 158(a)]." The difficulty is that the "appeals described" in the first sentence of § 158(a) are not appeals from the district court, but appeals directly from the bankruptcy court. So it's evident enough that § 158(d)(2)(A) gives us the authority to hear appeals straight from the bankruptcy court, leapfrogging over the district court or bankruptcy appellate panel in order to speed up the resolution of dispositive legal questions. *See Weber v. U.S. Tr.*, 484 F.3d 154, 157-58 (2d Cir. 2007). What's less certain is whether the statute *also* permits us to hear

- 4 -

interlocutory appeals from the *district court's* disposition of an interlocutory appeal of a bankruptcy court order, in this respect covering much the same ground as § 1292(b).

Fortunately, it turns out we don't have to decide that question in this case. We don't because, while this appeal was wending its way to us, the bankruptcy court confirmed an amended repayment plan the Woolseys submitted after their initial plan voiding Citibank's lien was rejected. The confirmation of an amended plan brought the bankruptcy proceedings to a close, surely constituting a final order subject to appeal. *See* 28 U.S.C. § 158(d)(1). Indeed, in the world of bankruptcy proceedings — a world where cases continue on in many ways for many years and lack the usual final judgment of a criminal or traditional civil matter — confirmation of an amended plan "is as close to *the* final order as any the bankruptcy judge enters." *See Interwest Bus. Equip., Inc. v. U.S. Tr. (In re Interwest Bus. Equip., Inc.)*, 23 F.3d 311, 315 (10th Cir. 1994) (internal quotation marks omitted).

Neither does the fact the Woolseys filed their notice of appeal in this court prematurely — after the district court decided its appeal but before the bankruptcy court confirmed the Woolseys' amended plan — deny them the right to appeal. In the multi-layered appellate world of bankruptcy practice this problem recurs not infrequently. And this circuit has responded by holding that, at least absent any indication of potential prejudice, a premature notice of appeal

- 5 -

involving a bankruptcy matter, even one (like this one) with an interstitial stop in the district court, ripens and becomes effective once "a final order approving [a] plan[] of reorganization" is entered. *Interwest*, 23 F.3d at 315; *see also Adelman v. Fourth Nat'l Bank & Tr. Co. (In re Durability, Inc.)*, 893 F.2d 264, 265-66 (10th Cir. 1990). This court's precedent, moreover, finds analogies of various sorts in most other circuits. *See, e.g., Community Bank, N.A. v. Riffle*, 617 F.3d 171, 173-74 (2d Cir. 2010) (*per curiam*); *Rains v. Flinn (In re Rains)*, 428 F.3d 893, 900-01 (9th Cir. 2005); *Watson v. Boyajian (In re Watson)*, 403 F.3d 1, 5 (1st Cir. 2005); *Official Comm. of Unsecured Creditors v. Farmland Indus., Inc. (In re Farmland Indus., Inc.)*, 397 F.3d 647, 649-50 (8th Cir. 2005); *In re Rimsat, Ltd.*, 212 F.3d 1039, 1044 (7th Cir. 2000); *In re Emerson Radio Corp.*, 52 F.3d 50, 53 (3d Cir. 1995); 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3926.2 at 290 (2d ed. 1996). After all, the bankruptcy court's refusal to confirm the Woolseys' initial plan has now become a final and irrevocable decision, no longer subject to reconsideration there: the bankruptcy proceeding is closed. The district court has likewise finished its work and can't revise any decision we render. Neither have the parties identified any prejudice anyone would suffer by taking up the appeal now. Cumulatively, it's clear everything that could be done below has been done.

But even this analysis, we must acknowledge, isn't without its wrinkles. The notion that proceedings in a district court cumulatively might give rise to a

final judgment was touched upon in *FirsTier Mortgage Co. v. Investors Mortgage Insurance Co.*, 498 U.S. 269 (1991). There, the Court interpreted Fed. R. App. P. 4(a)(2)'s instruction that a "notice of appeal filed after the announcement of a decision or order but before the entry of the judgment or order shall be treated as filed after such entry and on the day thereof." 498 U.S. at 272-73. While holding that the Rule allowed the appeal at issue, the Court proceeded, in a statement that may or may not have been essential to its holding, to say the Rule does not permit a premature notice of appeal from a "clearly interlocutory decision — such as a discovery ruling or a sanction order under Rule 11" because a "belief that such a decision is a final judgment would *not* be reasonable." *Id.* at 276 (emphasis in original); *see Gonzales v. Texaco Inc.*, 344 F. App'x 304, 307 (9th Cir. 2009) (unpublished) (suggesting all this language is dicta). Instead, the Court said, the Rule permits a premature notice of appeal only from decisions that themselves "*would be* appealable if immediately followed by the entry of judgment" because "[i]n these instances, a litigant's confusion" about the finality of the case is "understandable, and permitting the notice of appeal to become effective when judgment is entered does not catch the appellee by surprise." *FirsTier Mortg. Co.*, 498 U.S. at 276 (emphasis in original).

Whether and to what degree this discussion, even if controlling, pertains to bankruptcy practice is an open question. In the first place, it is a matter of some debate whether Rule 4(a)(2) — and so *FirsTier*'s gloss on it — supplies the sole

means for a court of appeals to secure jurisdiction over a prematurely filed appeal. The Rule, some argue, is but a rule of practice, not a limit on our statutory jurisdiction, and it might be supplemented by Fed. R. App. P. 2 when necessary to allow courts to hear prematurely filed appeals that may not satisfy its particular terms but involve sufficiently final decisions that we are statutorily entitled to hear them. *Compare Khan v. Attorney Gen.*, No. 11-1789, 2012 WL 3290155, at *3 n.2 (3d Cir. Aug. 14, 2012) (citing *Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581, 587 (3d Cir 1999) so arguing), *with Outlaw v. Airtech Air Conditioning & Heating*, 412 F.3d 156, 160 n.2 (D.C. Cir. 2005) (disagreeing).

One might debate, as well, whether and to what degree the Rule needs to be supplemented, by means of Rule 2 or otherwise, to fit the peculiarities of bankruptcy practice. The Rule seems to assume the court "announc[ing] a decision or order" is the same one that later enters "the judgment or order" embodying that previous announcement. Yet here of course we have an appeal from a decision announced by a district court concerning a final judgment (as it were) later entered by the bankruptcy court, no unusual situation in bankruptcy practice but surely not typical in the criminal or traditional civil practice to which the Rule seems to speak. And one might wonder whether compliance with Rule 4(a)(2) can be forfeited or waived if it does not describe the outer limits of our statutory jurisdiction. What it might say about any of this is surely a point for debate, but it is a curiosity all the same that *Interwest* and most related cases in

other circuits make no mention of the Rule (one way or the other) when discussing appeals involving premature notices of appeal in the bankruptcy context. And, perhaps like litigants in those cases, the litigants in ours have not suggested the Rule or *FirsTier* imposes any impediment to entertaining this appeal.

Beyond even all this, however, *FirsTier*'s relevance in bankruptcy practice is an open question for still a different reason: it isn't clear whether a circuit entertaining an appeal from a district court even needs to resort to the cumulative finality doctrine — or for that matter § 1292 or § 158(d)(2)(A), two other possibilities we've already discussed. When it comes to bankruptcy matters, Congress in § 158(d)(1) gives circuit courts jurisdiction to hear "final decisions" as well as final judgments, orders and decrees "entered under subsection[] (a)." Turning to § 158(a), Congress there gives district courts authority to entertain appeals from final judgments, orders and decrees, *and* certain interlocutory orders and decrees from the bankruptcy court. Meanwhile, though, no mention is made of "final decisions." Given this arrangement, one might wonder whether this court possesses jurisdiction under § 158(d)(1) to review a "final decision" of the district court "entered under subsection[] (a)," with respect to a bankruptcy court's interlocutory order — all without the necessity of any final bankruptcy court order. On this theory, the phrase "decision . . . entered under subsection[] (a)" as it appears in § 158(d)(1) permits us to review a district court's decision on

a purely interlocutory issue. As applied to this case, the district court's "final decision" rejecting the Woolseys' initial plan is enough to afford us jurisdiction: the finality of the bankruptcy court's proceedings is immaterial. *See* Wright, Miller, & Cooper, *supra*, § 3926.2 at 279-80 (discussing merits and demerits of this interpretation).

The layering of appeal on appeal in the bankruptcy context, where our usual ideas of finality are already put to the test, surely invites many and interesting questions. But while we cannot ignore them, neither must we decide them today. We don't have to do so because, even assuming a final bankruptcy proceeding is required to trigger our own jurisdiction under § 158(d)(1), and even assuming that Rule 4(a)(2) is the only means by which we may entertain cases involving a prematurely filed notice of appeal, this case satisfies the test this court has set forth for satisfying the Rule.

Though *FirsTier*'s cryptic and arguably tangential discussion about the limits of Rule 4(a)(2) is open to many different understandings, in *Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993), this court explained its understanding that, under the Rule, "a premature notice of appeal retains its validity only when the order appealed from is likely to remain unchanged in both its form and its content." *Id.* at 778. Admittedly, *Hinton* did not discuss *FirsTier* but it does post-date *FirsTier* and so controls our analysis of the Rule. While a panel of this court may sometimes recognize that a prior panel decision has been clearly

overruled by an intervening Supreme Court decision, *see, e.g., Currier v. Doran*, 242 F.3d 905, 912 (10th Cir. 2001), we are aware of no existing Tenth Circuit authority that might allow this panel to overrule another panel simply because the earlier panel didn't mention a still earlier and (possibly) relevant Supreme Court decision.

*Hinton*'s test, moreover, is clearly satisfied where, as here, the appealed order from the district court (or Bankruptcy Appellate Panel) resolves the only outstanding issue in what has, by the time it reaches us, become an otherwise completed bankruptcy proceeding. In these circumstances, the challenged order not only amounts to the order of a superior authority the bankruptcy court could not undo later, it resolves the only appealed issue to arise out of the now concluded bankruptcy proceedings and so could not be changed in any event. In this situation, no one can claim serious surprise that the appealed order is amenable to appellate review. Indeed, to hold otherwise might require the appealing party to undertake the useless gesture of appealing again to the district court the very same order it just issued, all so it could get the matter back to this court, surely a paper pushing process no one would reasonably expect the law to require. Because of the layering effect of review in bankruptcy, our situation is very different from an attempt to appeal a district court's discovery or Rule 11 sanctions order discussed in *FirsTier* that no party could reasonably think ended

the case. No similar injustice or circumvention of traditional concepts of finality are in play here.

Neither, in any event, could we hold otherwise. As we've already explained, *Interwest*, like so many similar decisions in other circuits, expressly authorizes bankruptcy appeal in the circumstances we face. And we are of course bound by that precedent, as well. To be sure, and as we've already indicated, *Interwest* (like *Hinton*) does not discuss *FirsTier*. But (again like *Hinton*) *Interwest* post-dates *FirsTier* and we see no fair way by which we might avoid its teachings.

Though we are able, ultimately and after the application of some elbow grease, to untie the jurisdictional knot and reach the merits of this case, we have paused to describe along the way a number of unresolved and beguiling questions so future litigants and district courts are not left unwarned or unwary — about the questions surrounding § 158(d)(2)(A)'s reach, the curious discrepancies of §§ 158(a) and (d), the anomalies of Rule 4(a)(2), and the still not entirely explored frontiers of *FirsTier*.

* * *

Now to the merits. May Chapter 13 debtors like the Woolseys void a state law lien secured by no remaining value in the collateral? By all appearances, the path to answering that question would seem to begin and end with the language of 11 U.S.C. § 506(d), a provision of the bankruptcy code allowing any debtor in

- 12 -

bankruptcy, regardless under which specific Chapter the debtor proceeds, to remove (or "strip off") certain liens. Section 506(d) explains that, "[t]o the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void." Or, put differently, if Citibank's claim *isn't* an "allowed secured claim," the statute appears to allow the Woolseys to void the lien just as they originally proposed.

We are convinced Citibank's claim is an "allowed" one. Section 502 provides that a claim filed by a creditor is "allowed" if nobody objects — and even if there is an objection, a claim is *still* allowed unless stated otherwise in § 502. 11 U.S.C. § 502(a)–(b). The parties avidly dispute whether the Woolseys ever properly objected to Citibank's claim, but nothing turns on their fight. It doesn't because, even assuming the Woolseys did object, no provision in § 502 "disallows" the bank's claim. Seeking to suggest otherwise, the Woolseys point to § 502(b)(1). That provision "disallows" claims that are "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." But it's beyond question that Citibank's claim is a valid mortgage enforceable under Utah law — and that leaves § 502(b)(1) without any bite here. Alternatively, the Woolseys say Citibank's claim is disallowed by § 506(a), if not by § 502. Flipping forward a few pages to § 506(a), however, reveals that it has precisely nothing to say about whether a claim is allowed or disallowed. By its terms

- 13 -

§ 506(a) applies only to claims that are already "allowed," making abundantly clear it doesn't "disallow" anything.

Even accepting that Citibank's claim is "allowed," though, there remains the question whether it is "secured." And on that question § 506(a)(1) turns out to have quite a lot to say:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.

The thrust of § 506(a) is to classify allowed claims (or portions of allowed claims) as either secured or unsecured, which in turn affects how the bankruptcy code treats them. The statute explains that for purposes of federal bankruptcy law a "secured claim" requires something more than a security interest recognized by state law. A claim, even if secured by a valid state law lien on property, qualifies as "secured" for purposes § 506(a) and federal bankruptcy law only to the extent it is supported by *value* in the collateral. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 239 (1989). To the extent that the lien is supported by some but not enough value to cover the whole debt, § 506(a) splits the claim in two, creating a secured claim and an unsecured claim. *Id*. at 239 n.3. So even if a lien qualifies as a valid security interest under state law, it gives rise to a "secured claim" for purposes of federal bankruptcy law only if and to the extent it is supported by value in the underlying property.

- 14 -

All this would seem to bring us within a simple syllogism from the end of this case. The code allows debtors to void liens that aren't "allowed" and "secured" claims. *See* 11 U.S.C. § 506(d). The code defines "allowed" claims. *See id*. § 502. It also defines "secured" claims. *See id*. § 506(a). And so one might be forgiven for thinking any lien either "disallowed" under § 502 or "unsecured" under § 506(a) would be void under § 506(d). Because Citibank's junior lien isn't backed by any value in the home, Citibank holds only an allowed *unsecured* claim and so its lien would appear to be voidable, just as the Woolseys argue.

But the law in this corner of bankruptcy practice doesn't follow such a straight path. It doesn't because of *Dewsnup*. *See Dewsnup v. Timm*, 502 U.S. 410 (1992). There, the Supreme Court considered § 506(d) in the context of a Chapter 7 bankruptcy proceeding and concluded that the term "allowed secured claim" means a claim "allowed" under § 502 and "secured" by a lien enforceable under state law. So it is, the Court held, value in the collateral has no bearing on the lien-voiding language of § 506(d): *any* lien secured under state law must be respected and protected from removal. *Id.* at 417. And it is precisely because of *Dewsnup*'s holding that the bankruptcy court and district court refused the Woolseys' effort to remove Citibank's lien using § 506(d).

Now, one might well ask: How can it be that to qualify as "secured claim" in § 506(a) some value is needed but a mere three subsections later in § 506(d),

value is irrelevant to whether a claim is "secured"?  It's surely a topsy-turvy result to give these two related provisions in the same statutory section entirely different (even opposing) meanings.  After all, it defies the Supreme Court's own "normal rule of statutory construction that identical words used in different parts of the same act are [presumed] to have the same meaning."  *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (internal quotation marks omitted).

Even so, the Supreme Court found § 506(d)'s use of the term "secured" sufficiently "ambiguous" that it felt at liberty to overlook these problems.  And the Court took the distinctly unusual step of finding the liberating ambiguity based on no more than the fact the litigants before it happened to disagree over the statute's meaning — an ailment surely afflicting most every statutory interpretation question in our adversarial legal system.  *Dewsnup*, 502 U.S. at 416; *see also id.* at 422-23 (Scalia, J., dissenting) (criticizing the idea that a statutory ambiguity might be "achieved by being the subject of disagreement between self-interested litigants").  Still, in light of the ambiguity so generated, the Court felt free to strike out to interpret § 506(d) on its own, unchained by § 506(a)'s plain language.

Turning to historical practice for guidance, the Court said that state law liens in Chapter 7 cases, at least before the enactment of the current bankruptcy code, "pass[ed] through the bankruptcy case unaffected," retaining their force whether backed by value or not.  *Id.* at 418.  Without some indication in the

legislative history that Congress intended to alter this practice, the Court decided to interpret § 506(d) the same way in order to avoid "effect[ing] a major change in pre-[c]ode practice." *Id*. at 418. The Court also worried that any other result would bestow upon the debtor the "windfall" of any increase in value during the pendency of the bankruptcy, value more appropriately belonging to the lienholder. *Id.* at 417.

Even on their own terms these rationales are open to question. Whatever pre-code practice looked like, it would seem to have (at best) limited interpretive significance today, given that Chapter 7 indubitably permits liens to be removed in many situations. *See Harmon v. United States*, 101 F.3d 574, 581 (8th Cir. 1996) (collecting examples); *In re Penrod*, 50 F.3d 459, 461-62 (7th Cir. 1995). And it's far from clear how much we have to worry about the debtor winning a windfall: in most Chapter 7 cases it will be the remaining unsecured creditors rather than the debtor who will reap any appreciation in the property's value. *See Dewsnup*, 502 U.S. at 422 n.1 (Scalia, J., dissenting); *see also* David Gray Carlson, *Bifurcation of Undersecured Claims in Bankruptcy*, 70 Am. Bankr. L.J. 1, 10-11 (1996). Even more fundamentally still, when it comes to interpreting statutes the Court itself has repeatedly instructed that pre-enactment practice is relevant only "to the interpretation of an ambiguous text" and holds no sway when the statutory language is clear. *RadLAX Gateway Hotel, LLC v.*

*Amalgamated Bank*, 132 S. Ct. 2065, 2073 (2012).  And the language of § 506(a) and (d) does seem pretty plain.

All this has led Justice Thomas to observe that *Dewsnup* has created more than a little "methodological confusion," confusion "enshroud[ing] both the Courts of Appeals and, even more tellingly, Bankruptcy Courts, which must interpret the Code on a daily basis."  *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 North LaSalle Street P'ship*, 526 U.S. 434, 463 (1999) (Thomas, J., concurring in the judgment).  In fact, both *Dewsnup*'s decision to depart from the plain language of § 506(a) and the rationales it supplied for doing so have engendered many critics.[1]

But this much still is clear.  Right or wrong, the Dewsnuppian departure from the statute's plain language is the law.  It may have warped the bankruptcy code's seemingly straight path into a crooked one.  It may not be infallible.  But until and unless the Court chooses to revisit it, it *is* final.

_____

   [1]  For a sampling of these criticisms, and beyond those found in the powerful dissent in *Dewsnup* itself, *see, e.g.*, *Bank of Am. Nat'l Trust*, 526 U.S. at 462-63 (Thomas, J., concurring in the judgment); *Cunningham v. Homecomings Fin. Network (In re Cunningham)*, 246 B.R. 241, 245-46 (Bankr. D. Md. 2000); *Dever v. IRS (In re Dever)*, 164 B.R. 132, 138 (Bankr. C.D. Cal. 1994); Lawrence Ponoroff & F. Stephen Knippenberg, *The Immovable Object Versus the Irresistible Force: Rethinking the Relationship Between Secured Credit and Bankruptcy Policy*, 95 Mich. L. Rev. 2234 (1997); Carlson, *supra*, at 12-20; Barry E. Adler, *Creditor Rights After* Johnson *and* Dewsnup, 10 Bankr. Dev. J. 1, 10-12 (1993); Mary Josephine Newborn, *Undersecured Creditors in Bankruptcy:* Dewsnup*,* Nobelman*, and the Decline of Priority*, 25 Ariz. St. L.J. 547 (1993); Margaret Howard, *Dewsnupping the Bankruptcy Code*, 1 J. Bankr. L. & Prac. 513 (1992).

That doesn't stop the Woolseys from trying to argue otherwise. In their view, *Dewsnup* controls the meaning of the term "secured" under § 506(d) only in Chapter 7 cases. The very same term in § 506(d), they contend, should be given an entirely different meaning when it comes to handling Chapter 13 cases — requiring proof of value to avoid lien removal, just as the plain language of § 506(a) suggests. And we must admit their argument isn't entirely without appeal.

Take *Dewsnup*'s reasoning first. When interpreting § 506(d), *Dewsnup* relied heavily on perceptions about Chapter 7 practice. But, of course, § 506(d) applies equally to bankruptcies like the Woolseys' proceeding under Chapter 13. And as the Woolseys point out, very different considerations are at work in Chapter 7 liquidation bankruptcies than in reorganization bankruptcies under Chapter 13. In a Chapter 7 bankruptcy, the debtor liquidates his non-exempt assets to provide for immediate repayment of as much of his debt as possible, and in exchange receives immediate relief from dischargeable debt. *See Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007). The satisfaction of secured creditors comes primarily from a foreclosure sale of the collateral, and for this reason under pre-code practice there wasn't usually much reason to allow the debtor to void a lien on property he will be forced to surrender in any event. By contrast, in a Chapter 13 case the debtor's obligations are not met primarily through liquidation. Instead of selling his assets to meet his debts, the debtor has

- 19 -

to commit a portion of his *future* income for a period up to five years as part of the bankruptcy repayment plan. In exchange, "[t]he benefit to the debtor of developing a plan of repayment under Chapter 13, rather than opting for liquidation under Chapter 7, is that it permits the debtor to protect his assets." H.R. Rep. No. 95-595, at 118 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6079.

All this suggests that lien stripping has a very different role to play in Chapter 13 than in Chapter 7. While voiding a lien may afford few benefits in a Chapter 7 proceeding, it may be more integral to achieving Chapter 13's goals. After all, if the law always precluded lien stripping in the Chapter 13 context, a debtor hoping to keep his property would have to provide for full repayment of a lien no matter how large, even if his debt is secured by worthless collateral. Faced with the prospect of paying much more than the property is worth under a Chapter 13 plan, many more debtors would likely throw up their hands and simply opt for liquidation. And this result would run contrary to Congress's preference for individual debtors to use Chapter 13 instead of Chapter 7. *See id.* at 118. It would undercut Congress's aim to allow individual debtors "to retain the pride attendant" on satisfying a repayment plan rather than face the "stigma" of liquidation. *Id.* It would thwart Congress's stated purpose to change "the treatment of secured creditors" in Chapter 13 to focus on "the true value of the goods" secured as collateral rather than simply the lien's "value as leverage" against the debtor. *Id*. at 124. And it would not even obviously help creditors as

a whole: because Chapter 13 debtors commit future income to debt repayment, unsecured creditors' losses are often "significantly less than [when] debtors opt for" liquidation. *Id.* at 118; *see also In re McDonald*, 205 F.3d 606, 614 (3d Cir. 2000). For all these reasons, and as *Dewsnup* itself recognized, pre-code practice in reorganization cases like those under Chapter 13 (unlike pre-code Chapter 7 liquidation practice) often *permitted* liens to be stripped down to the value of the collateral. 502 U.S. at 418-19.[2]

Not only does *Dewsnup*'s reasoning rest on peculiarities of the Chapter 7 context bearing little relevance to Chapter 13 practice, the case expressly instructs us to read its holding narrowly. It tells us that its holding is limited to "the case before us" and that "other facts . . . await their legal resolution on another day." *Id.* at 417. It adds candidly that the Court found it impossible to "interpret[] the statute in a single opinion that would apply to all possible fact situations." *Id.* at 416. And taking up this invitation to give the decision a crabbed reading, every federal court of appeals to consider the question has already refused to extend

---

[2] *See also Haberman v. St. John Nat'l Bank (In re Haberman)*, 516 F.3d 1207, 1213 (10th Cir. 2008); *Enewally v. Wash. Mut. Bank (In re Enewally)*, 368 F.3d 1165, 1170 (9th Cir. 2004) ("The rationales advanced in the *Dewsnup* opinion for prohibiting lien stripping in Chapter 7 bankruptcies . . . have little relevance in the context of rehabilitative bankruptcy proceedings under Chapter 11, 12, and 13, where lien stripping is expressly and broadly permitted") (quotation omitted); *Wade v. Bradford*, 39 F.3d 1126, 1128 (10th Cir. 1994); *Harmon*, 101 F.3d at 581-82 & n.4; Margaret Howard, *Secured Claims in Bankruptcy: An Essay on Missing the Point*, 23 Cap. U. L. Rev. 313, 314-16 (1994).

*Dewsnup*'s definition of the term "secured claim" to other statutory provisions using that term in Chapter 13, where the focus is on reorganization rather than liquidation.[3] This same pattern — of circuits distancing themselves from *Dewsnup* — recurs in Chapter 11 and Chapter 12 reorganization cases.[4] Most notably, the Supreme Court itself has declined to extend *Dewsnup*'s understanding of the term "secured claims" when it appears in Chapter 13. *See Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 328 (1993) ("secured claim" in § 1322(b)(2) is defined with reference to § 506(a) and the value of the collateral); *Assocs. Commercial Corp. v. Rash,* 520 U.S. 953, 960 (1997) (same in § 1325(a)(5)(B)). So it is that *Dewsnup* has lost every away game it has played: its definition of "secured claim" has been rejected time after time elsewhere in the code and seems to hold sway only in § 506(d).

Building on all this, the Woolseys invite us to hand *Dewsnup* a loss even on its home court, within § 506(d) itself. *Dewsnup* suggests that the term "secured claim" may mean something different in § 506(d) than it does in the rest of the bankruptcy code, and many circuits and the Supreme Court itself have now

---

[3] *See, e.g.*, *Haberman,* 516 F.3d at 1213; *Enewally*, 368 F.3d at 1169-70; *Bartee v. Tara Colony Homeowners Assoc. (In re Bartee)*, 212 F.3d 277, 291 n.21 (5th Cir. 2000).

[4] Chapter 11: *Wade v. Bradford*, 39 F.3d 1126, 1128-30 (10th Cir. 1994); *In re Heritage Highgate, Inc.*, 679 F.3d 132, 144 (3d Cir. 2012). Chapter 12: *Okla. ex rel. Comm'rs of the Land Office v. Crook (In re Crook)*, 966 F.2d 539, 539 n.1 (10th Cir. 1992); *Harmon*, 101 F.3d at 582.

(repeatedly) held as much. All that, of course, is curious enough in light of the "normal rule" that identical words bear identical meaning throughout a statutory structure. *Sullivan*, 496 U.S. at 484. But, the Woolseys say, we should go now a step further and read the term "secured claim" to mean two different things *even within § 506(d) itself.* When a Chapter 7 case comes along, they say, the term should mean what *Dewsnup* says it means: any claim secured under state property law is protected from removal, even if backed by no value. But when a court is faced with a Chapter 13 case, they argue, the term should be read to require proof of value before a lien is protected from removal in accord with § 506(a). They stress that *Dewsnup*'s rationales are limited to Chapter 7 cases and that *Dewsnup* itself seems to suggest the term "secured claims" may be interpreted to mean different things in different "fact situations." 502 U.S. at 416.

Though we must admit the Woolseys' invitation to undo *Dewsnup* in this way has its attractions, it's an especially odd invitation to issue, let alone for this court to accept. After all, it violates yet another and even more elementary rule of statutory interpretation: the rule against "[a]scribing various meanings to a *single* iteration" of a statutory term in different applications. *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) (emphasis added) (internal quotation marks omitted). Though giving a term different meanings in different but related statutes is one thing and disfavored enough, in recent years the Supreme Court

has suggested that giving a *single* use of a term different meanings is another thing altogether, a ploy not just frowned upon but methodologically incoherent and categorically prohibited: "To give these same words a different meaning for each category [of cases to which they apply] would be to invent a statute rather than interpret one." *Clark v. Martinez*, 543 U.S. 371, 378 (2005); *see also id*. at 386 (rejecting "the dangerous principle that judges can give the same statutory text different meanings in different cases"); *United States v. Santos*, 553 U.S. 507, 522-23 (2008) (opinion of Scalia, J.) (*Clark* "forcefully rejected" the notion that courts could "giv[e] the same word, in the same statutory provision, different meanings in different factual contexts" (emphasis omitted)).

Applying this rule, the Supreme Court has refused to give different meanings to a single statutory term even when the case for doing so is far stronger than the case the Woolseys are able to muster here. In *Clark*, for example, the Supreme Court held that when a statutory provision is given a limiting construction to avoid a serious constitutional question arising from one of its potential applications, that interpretation governs *all* applications of the provision — even those that do not raise the same constitutional concerns. *Clark*, 543 U.S. at 377-78. While noting that "the statutory purpose and the constitutional concerns" motivating the prior limiting construction were not present in the case before it, the Court held this still "cannot justify giving the *same* . . . provision a different meaning" in different factual circumstances. *Id*. at

380 (emphasis in original). Rather, "the lowest common denominator, as it were, must govern." *Id*. Similarly, the Court has held, when a statute possesses both criminal and civil applications a narrowing interpretation in a criminal case driven by the rule of lenity must apply equally to civil litigants to whom lenity would not ordinarily extend. *Id*. at 380 (citing *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517-518 & n. 10 (1992) (plurality opinion) and *id*. at 519 (Scalia, J., concurring in judgment)). If the rules of lenity and constitutional avoidance — powerful and long-standing interpretive traditions — fail to justify giving multiple meanings to a statutory term, it's difficult to see how anything the Woolseys offer us in this case might.

Not only is the rule against multiple interpretations of the same statute well entrenched, it is of special importance. Without it, even a statutory term used but a single time in a single statute risks never settling on a fixed meaning. And this surely would leave citizens at sea, only and always guessing at what the law might be held to mean in the unique "fact situation" of the next case — a result in no little tension with the rule of law itself. *See id*. at 382 (to accept that the same statutory provision could have multiple meanings "would render every statute a chameleon, its meaning subject to change . . . in each individual case").

Given all this, it's perhaps no surprise that of all the circuit courts approving of lien stripping in reorganization cases, not a single one has taken up the Woolseys' invitation to do so using § 506(d). Instead, they have relied

exclusively on other statutory provisions particular to those chapters. *See, e.g.*, *Wade*, 39 F.3d at 1129 (permitting lien stripping in Chapter 11 cases under 11 U.S.C. § 1129(b)(2)); *Harmon*, 101 F.3d at 583 (permitting lien stripping in Chapter 12 cases under 11 U.S.C. § 1225(a)(5)); *In re Lane*, 280 F.3d 663, 665 (6th Cir. 2002) (permitting lien stripping in Chapter 13 cases under 11 U.S.C. § 1322(b)(2)); *see also* 4 *Collier on Bankruptcy*, ¶ 506.06[1] (16th ed. 2011) ("[T]here is no principled way to conclude that, although section 506(d) does not authorize lien stripping in chapter 7 cases, it has a different meaning in chapter 11, 12, and 13 matters.").

In light of recent and unambiguous Supreme Court precedent repudiating the interpretive move the Woolseys invite us to take, and because the Woolseys never even pause to confront this precedent, we decline to follow where they wish to lead. We do not doubt a strong argument can be made that the language and logic of § 506 permit the Woolseys to void not only Citibank's lien but any lien to the extent it is unsupported by value in the collateral. But we fail to see any principled way we might, as lower court judges, get there from here. *Dewsnup* may be a gnarled bramble blocking what should be an open path. But it is one only the Supreme Court and Congress have the power to clear away.

* * *

Having said that much, we candidly acknowledge we thought at first there might possibly be a way around *Dewsnup*, if not a way to plow through it so

- 26 -

directly as the Woolseys urge. As we've already alluded to, many courts seeking to avoid *Dewsnup*'s pinch have invoked provisions specific to the reorganization chapters to permit the removal or stripping down of liens unsupported by value. And when it comes to Chapter 13, many courts have already identified one apparently promising candidate in § 1322(b)(2).

Section 1322 sets forth the provisions a Chapter 13 reorganization plan may contain (as well as some that it must). Relevant for our purposes is § 1322(b)(2), which provides that the plan may

> modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims[.]

In broad strokes, this provision permits a debtor's plan to modify the rights of secured or unsecured creditors — all as part of Chapter 13's general effort to find a realistically achievable repayment plan. Of course, the power to modify creditors' claims is qualified — qualified both by other parts of § 1322 not at issue here, and by § 1322(b)(2)'s own internal limitation on the modification of secured claims in real property. But those exceptions aside, the first and third clauses of § 1322(b)(2) arm the debtor with considerable power to modify the rights of secured and unsecured creditors alike.

At first we wondered whether this modification power might include the ability to strip off a lien unsupported by value in its collateral. To be sure,

§ 1322(b)(2) itself prohibits modification of the rights of the "holder of a secured claim" supported by a lien on the debtor's home. But the Supreme Court's decision in *Nobelman v. American Savings Bank*, 508 U.S. 324 (1993), can be read to suggest that for a claim to be "secured" and therefore trigger the anti-modification clause in § 1322(b)(2), it must be supported by at least some value in the collateral — just as § 506(a) (but not *Dewsnup*) says. *Nobelman*, 508 U.S. at 328-31. Indeed, no fewer than six circuits have already read *Nobelman* this way and held a debtor may invoke § 1322(b)(2) to remove a wholly unsecured lien, even if that lien is secured against the debtor's principal residence. *See Lane v. W. Interstate Bancorp (In re Lane)*, 280 F.3d at 665; *Zimmer v. PSB Lending Corp. (In re Zimmer)*, 313 F.3d 1220, 1221 (9th Cir. 2002); *Pond v. Farm Specialist Realty (In re Pond)*, 252 F.3d 122, 127 (2d Cir. 2001); *McDonald*, 205 F.3d at 615; *Bartee*, 212 F.3d at 280; *Tanner v. FirstPlus Fin., Inc. (In re Tanner)*, 217 F.3d 1357, 1360 (11th Cir. 2000); *see also* 8 *Collier on Bankruptcy*, *supra*, ¶ 1322.06[1][a][i].

The hitch is, the Woolseys didn't choose to pursue this line of argument before this court in their initial briefs. What's more, they have now expressly repudiated it in a supplemental submission. This even though the bankruptcy court offered a favorable discussion of lien stripping under § 1322(b)(2), uniform circuit precedent endorses it, and an amicus brief in this case from the National Association of Consumer Bankruptcy Attorneys ably argued the point. For their

part, however, the Woolseys only glancingly referred to § 1322(b)(2) in their opening briefs. Wanting to know more about that provision in light of all the authority discussing it as a possible avenue for relief for debtors like the Woolseys, we decided to ask the parties for supplemental briefing on the question whether § 1322(b)(2) permits a Chapter 13 debtor to remove a wholly unsecured lien even if § 506(d) does not. In response, the Woolseys made plain that they wanted no part of the argument. They emphatically announced "[t]here is no Code provision other than 11 U.S.C. §506(d) that declares void a wholly unsecured lien." Appellants' Supp. Br. at 4.

And that leaves us in an awkward place. There's a potentially promising argument for the Woolseys, one suggested by their own amicus, but one they want no part of. Whatever our power to tackle the § 1322(b)(2) question in these circumstances, nothing *requires* us to do so, to foist on litigants arms they so avidly refuse to take up in the adversarial arena. So in deference to their wishes, we opt today against forcing a § 1322(b)(2) argument onto the unwilling Woolseys and leave that statute and its meaning for another day when a bankruptcy petitioner actually wants to pursue the question. In this case, we limit ourselves to the question the Woolseys do want us to address: did the bankruptcy and district courts err in holding that § 506(d) precluded them from removing Citibank's lien? The answer to that narrow question, we have seen, has to be no

so long as *Dewsnup* remains the law.  For that reason (and that reason alone) we

affirm.[5]

---

[5]  Because this is a sufficient basis to affirm the bankruptcy court's refusal to confirm the plan proposing to remove Citibank's lien, we have no need to consider the bankruptcy court's separate holding that the Woolseys' plan was *also* deficient for failing to include the so-called "lien retention" language in § 1325(a)(5)(B)(i)(II).